51 342
127 372
51 342
129 609
29a 407
51 342
136 203
51 342
149 336
149 521
51 342
55a 335
51 342
59a 527
51 342
69a 653
70a 619
51 342
74a 184
51 342
86a 448
87a 572
51 342
101a ᵒ 57
51 342
d200 ᵇ277
51 342
110a ᶜ476

# ÆTNA INSURANCE COMPANY

*v.*

# TERRENCE MAGUIRE *et al.*

1. POLICY OF INSURANCE—*of prohibited risks.* Where, by the terms of a policy of insurance, it is forbidden to the agents to take certain risks, as for instance, " distilleries and steam saw-mills," the import of the prohibition will be held to apply to " distilleries and steam saw-mills" in operation, and not to buildings erected for such purposes, but lying inactive and unused.

2. APPROVAL OF POLICY—*by general agent—what constitutes.* A local agent of an insurance company issued a policy, which by its terms was subject to the approval or disapproval of the general agent. The premium was paid to the local agent, who, in making his monthly returns to the general office, included it in his return, and it was paid over to that officer, and a credit was given to the local agent therefor on the books. Soon afterward, the general agent instructed the local agent to cancel the policy. These acts of the general agent were held to be a recognition of the existence of the policy, and to give it all requisite validity. The very fact of an attempt at cancellation, was an admission that there was a policy capable of being canceled, and it is not for the company afterwards to deny it.

3. CANCELLATION OF POLICY—*what constitutes—of acts of the respective parties.* A policy of insurance was issued, subject to the condition, that the company might cancel the same upon giving notice to the assured, and returning the unearned premium. The general agent of the company directed the local agent who issued the policy, to cancel it, and sent him a cancelling card to deliver to the assured. The local agent inclosed the cancelling card in a letter to the assured, whose post office was at a distance, and stated in the letter that the unearned premium was in his hands, subject to the order of the assured. Before this letter was received by the assured, the local agent saw him, told him of the letter and its contents, but told him not to mind the cancelling card, as he would carry the risk until he heard from him again. Afterwards, the assured addressed a letter to the local agent, directing him to transfer the policy to another company, of which he was also the agent. This request the agent did not comply with, and nothing further was done in respect to the matter of cancellation, until, finally, a loss occurred : *Held,* there was no cancellation of the policy.

4. The request of the assured to the agent, to transfer the policy to another company, did not, of itself, operate as an acceptance by the assured of the act of cancellation, nor did it constitute the agent of the company his agent for the purpose of such transfer, nor was it a disposal of the premium

money in the agent's hands, inasmuch as the latter did not act upon the request, or accept the agency of the assured in respect thereto.

5.  Where an insurance company reserves the right to cancel a policy, upon giving notice to the assured, and returning the unearned premium, it is not enough for the company to inform the assured that the money is ready for him, subject to his order; the money must be tendered to the assured. The acts of refunding the money and cancellation, must be simultaneous.

6.  AGENTS *of insurance companies—of their authority.*  Where an insurance company has appointed an agent, known and recognized as such, and he by his acts, known and acquiesced in by them, induces the public to believe he is vested with all the power and authority necessary for him to do the act, and nothing to the contrary is shown or pretended at the time of doing the act, the company is liable for such of his acts as appear upon their face to be usual and proper, in and about the business in which the agent is engaged.  And where a loss happens, the company should not be permitted to say, in any case, their agent acted beyond the scope of his authority, unless it shall be made to appear the insured was informed of and knew the precise extent of the authority conferred.

7.  So, where an insurance company appointed an agent for a particular locality, and such agent issued a policy upon property outside of such locality, and upon such policy being submitted to the general agent of the company, no objection was made that the local agent had exceeded his authority, and the taking of the risk was acquiesced in, the company shall not afterwards be permitted to allege the want of authority in the local agent to issue the policy.

8.  RIGHT OF ACTION—*when it accrues.*  A condition in a policy of insurance, to the effect, that " payment of losses shall be made in sixty days after the loss shall have been ascertained and proved," is construed to apply to cases where the company agree to pay the loss, or are undecided what they will do, but does not apply where the company peremptorily refuse to pay the loss.  In such case, suit may be brought immediately upon such refusal, without reference to such condition.

APPEAL from the Circuit Court of Cook county; the Hon. ERASTUS S. WILLIAMS, Judge, presiding.

The opinion states the case.

Messrs. SLEEPER, WHITON & DURHAM, for tne appellants.

Messrs. GOOKINS & ROBERTS, for the appellees.

Mr. CHIEF JUSTICE BREESE delivered the opinion of the Court:

This was an action of assumpsit, brought to the Circuit Court of Cook county, by Terrence Maguire, Ludwig Wolf and William Barry, against the Ætna Insurance Company, upon a policy of insurance No. 320, and a verdict and judgment for the plaintiffs. An appeal was taken to this court at the September term, 1868, and the judgment reversed.

Upon the petition of the plaintiffs, and on the suggestion this court had not given sufficient consideration to some important facts in the case, a rehearing was ordered.

A rehearing has been had, and we will consider the case as one now before us for the first time.

The policy was written by James Sweet, an agent of defendants, at Nebraska City, on the 6th of September, 1865, and by him countersigned on that day.

By this policy, the defendants, in consideration of $175, insured the plaintiffs against loss or damage by fire, to the amount of $2,500 for one year, as follows: $1,000 on their two and one-half story frame distillery building and one story saw mill building attached, known as the Patterson Mills, occupied by the assured as a distillery and saw mill, and situated in the Rock Bluff precinct, in Cass county, Nebraska territory; $500 on boiler, engine, &c.; $500 on distillery fixtures, tubs, &c., and $500 on stock of liquors and grain, all contained in said buildings.

On the same day, an insurance, to the same amount, was effected in the Phœnix Insurance Company, of which Sweet was also the agent.

Eighteen conditions were annexed to the policy, as part thereof, and after stating what goods were not hazardous, what were hazardous, and what extra hazardous, to this latter clause is this: "The following are not to be be insured at any rate of premium, viz: brimstone works, distilleries, flax mills, gun powder, &c., steam saw mills, &c." Condition 5 of the policy, provides that, for any cause the company shall elect, it shall

be optional with the company to cancel this policy, after notice given to the assured, or his representative, of their intention so to do, in which case the company will refund the premium for the unexpired term. There was another clause, to the effect that the policy should not be valid until countersigned by the duly authorized agent of the company at ———. It was duly countersigned by James Sweet, agent at Nebraska City.

On the 20th of November, 1865, an assignment of the interest of Maguire, Wolf and Barry, was endorsed on the policy to Terrence Maguire.

On the 29th of January, 1866, the premises were destroyed by fire. After the fire, Sweet, the agent, endorsed on the policy the assent of the company to the assignment, his assent bearing the same date as the assignment.

The first point made by appellants is, that Sweet, the agent, had no power to write this policy and bind the company. It is said he was a special agent, and exceeded his authority in taking a risk on a distillery and steam saw mill, risks specially forbidden by the very terms of the policy, and further, that the policy was subject to the approval of the general agent at Cincinnati; that it never received his approval, and therefore is not binding on the company.

Upon the first proposition, it is true, the policy enumerates distilleries and steam saw mills as property on which no risks will be taken; but what was understood and contemplated by the use of those terms? Most clearly, it seems to us, distilleries and saw mills in operation. This policy does not purport to be upon such, but upon the buildings, inactive, unused, not exposed to the hazards of such buildings in active operation. Should they be put in operation after the delivery of the policy, provision is made for that in the policy, in these terms: "And it is agreed and declared to be the true intent and meaning of the parties hereto, that in case the above mentioned buildings shall, at any time after the making, and during the continuance of this insurance, be appropriated, applied or used to or for the purpose of carrying on or exercising therein any trade,

business or vocation, denominated hazardous, extra hazardous, or included in the memorandum of special rates, or in the conditions annexed to this policy, or for the purpose of stowing or vending therein any of the articles, goods or merchandize in the conditions aforesaid, denominated hazardous, extra hazardous, or included in the memorandum of special rates, unless herein otherwise specially provided for or hereafter agreed by this company in writing, and added to or endorsed upon this policy, then and from thenceforth, so long as the same shall be so appropriated or used, these presents shall cease, and be of no force or effect."

So, far, then, as the subject matter of the policy is concerned, the agent had full power to take the risk. It is to be presumed, either he knew the buildings were not being used for the purposes for which they were erected, or if they should be, after the delivery of the policy, they would come under the operation of the condition above quoted. The premium was a heavy one, seven per cent. of the amount insured, and but a trifling risk. If appropriated, afterwards, to a hazardous business, without the assent of the company, the policy would be null and void. Insurance companies, anywhere, would be much gratified at opportunities to take such risks, and would eagerly embrace them, as their object is to make money —to receive large profits from small hazards.

As to the other branch of the proposition, is it true the general agent disapproved this policy ?

It was sent him, in due course of business. The premium was paid by the assured about September 10th or 12th, 1865, and the agent, in making his monthly returns to the general office, included it in his returns for that month, and it was paid over to that office, and a credit given Sweet, the agent, therefor, on the books, and it is in their treasury now.

What did the general agent do when he saw this risk on the monthly account of his agent ? Did he repudiate it? Did he order an instant return of the whole premium ? He

did neither. He merely said, under date of October 7, "Please cancel pol. 320. Enclosed find cancelling card."

Now, the question arises, if there was no policy in existence, how could it be canceled? The very fact of an attempt at cancellation, is an admission there was a policy capable of being canceled, and it is not for the company now to deny it. The acts of the general agent are an emphatic recognition of the existence of the policy, and give to it all requisite validity. They acknowledge it to be a subsisting risk.

This letter of cancellation, from the general agent, bears date October 7, and is addressed to Maguire, Wolf and Barry, and came to the hands of the local agent on the 13th, on which day he addressed a letter to the assured, Rock Bluff, N. T., when he had been told by Maguire, before the policy was issued, that his postoffice was Plattsmouth, where he was every day. Maguire did not, in consequence of this misdirection by Sweet, receive the letter until the 5th of December. In the interval, he had an interview with Sweet, at Plattsmouth, between the 14th and 20th of November, when something was said by Sweet, he being at the same time an assessor under the internal revenue laws of the United States, about the execution of a distiller's bond, at which interview Maguire told him that he had so much machinery to put up, he did not think he would get strait for a good while. Sweet then asked him if he had received a cancelling card that he had sent him; being answered in the negative, Sweet said, "You need not mind, being as you are not going to run. The company was laboring under the impression that the distillery was running. You need not mind; I will carry the risk until you hear from me." Sweet was not asked where he had sent the cancelling card, when, about the 1st of December, Maguire happening to be at Rock Bluff, the postmaster there told him there was a letter for him, which he then received.

After deliberating some time over the matter, the letter of December 5 was written, in which, submitting to his fate, he

says: "You will please transfer Ætna policy to Phœnix, of Hartford, and make this change, *  *  * and let the policy issue in the name of Terrence Maguire, as I am all alone in this concern. The other policy (Phœnix?) I wish you would change, as I thought, when I took the insurance, my partners in Chicago would go in with me, but they backed out, and I have to run it alone. I hope you will do the best you can. *  * Please let me hear from you as soon as convenient, and much oblige, &c."

It is claimed, on the part of appellants, that this letter is an acceptance of the act of cancellation, and the request contained in it to Sweet, to change the policy to the Phœnix, made Sweet Maguire's agent for such purpose, and was a virtual disposal, by Maguire, of the premium money in Sweet's hands, to be applied to such purpose.

This deserves consideration. If the policy in the Ætna was originally binding, as it clearly was, Maguire could not cancel it, had he been so disposed. The local agent did not cancel it; on the contrary, he had, at Plattsmouth, in November preceding, directed Maguire not to mind the card, saying to him, as you have not received it—as you do not intend to put your works in operation, the risk will be carried until you hear from me; and as I am a revenue officer, you can not run the distillery without executing to me a bond, and when you come to do that, the policy can then be canceled, as is provided by its terms. This understanding was verbal, and notwithstanding it was bad, Maguire could not know what effect it might have on his relations with the company, and desiring to have some certain security, he gave the direction, to turn it over to the Phœnix. But Sweet did not do this, nor did he make any reply to this important letter, so earnestly requesting a reply, and so necessary one should be sent, in the emergencies of Maguire's condition. The premium money is retained by the Ætna company; no tender of it has ever been made to Maguire, and for the simple reason that Sweet well knew that the company were carrying the risk. This is clearly manifest

from Sweet's own declarations after the fire, made in the presence of Mrs. Babcock, to Maguire, at Sweet's office. He then and there said, that he had not canceled the policy; that he was insured in two good companies, the Phœnix and Ætna, in the sum of $5,000; and he further, then, said, that he had directed his clerk to write and inform Maguire that he had determined to continue the risk and not cancel the policy, in view of the fact that the distillery was not to be operated, and that the loss wou d be adjusted to his satisfaction. The same statements, substantially, were made by Sweet to O'Brien, two weeks afterwards. If the company were not carrying this risk, what did their agent mean by this letter of February 12, 1866, addressed to T. Maguire: "Dear sir: I have heard nothing more from the insurance companies, than that an adjuster will be dispatched immediately to look after the loss. You may rest assured, everything will be fixed, as soon as possible, to your satisfaction. Yours truly, James Sweet, agent." And what, by accepting the preliminary proofs? And further, it may be asked, why did Sweet write to the general agent, after the fire, that the distillery insured under policy 320 was burned, and express regret for the loss, and say it was insured, $2,500 in the Ætna and $2,500 in the Phœnix?

And what did the company mean, when they sent Mr. Holland, from St. Louis to Nebraska, to adjust the loss? and what did Holland intend, when he got up other papers and had them in form respecting the loss, and this at Sweet's office, where the policy was? What did he mean when he offered to pay Maguire $2,000 as compensation for this loss? The only question the parties then differed about was, whether malt was included in the term "grain," as used in the policy! These facts are established by the verdict. Surely, an adjuster would not have been sent out to look to this loss, if the company had not understood they were liable. As for the acts and declarations of Sweet, appellants insist, in all of them he was acting without authority, and they can not bind them.

This is the plea in bar, as to all of the acts of the agent from the inception of the policy to this time. The general agent says, Sweet's jurisdiction was limited to Nebraska City, but he does not urge that as an objection to the policy, in his letter requesting the agent to cancel it, nor can it be tolerated that these companies shall send agents, on whom they have impressed their confidence by appointing them, into States and countries remote from the place of their organization, and from their general office, seemingly clothed will all the powers necessary to enable them to gain the confidence of the people, and through that, get money for their stockholders, be permitted to say, when a claim is made upon them, that the agent had instructions, unknown to the public, restricting the powers they permitted him to exercise, and which he did exercise, or to say his powers were very limited, and we can not answer for any thing he may have done outside of the power especially given him. We desire it should be understood, in this jurisdiction at least, when an insurance company has appointed an agent, known and recognized as such, and he, by his acts, known and acquiesced in by them, induces the public to believe he is vested with all the power and authority necessary for him to do the act, and nothing to the contrary is shown or pretended at the time of doing the act, public policy, the safety of the people, demand, the company should be liable for such of his acts as appear, on their face, to be usual and proper in and about the business in which the agent is engaged. It is the fault of the companies in sending agents out among the people, gaining public confidence by the seeming acquiescence of their constituents in the conduct of their business. When a loss happens, they should not be permitted to say, in any case, their agent acted beyond the scope of his authority, unless it shall be made to appear the assured was informed of, and knew, the precise extent of the authority conferred. Any other principle, in its operation, would be turning loose upon an unsuspecting, honest and confiding people, a horde of

plunderers, against which no ordinary vigilance could guard. *N. E. F. & M. Ins. Co.* v. *Schettler*, 39 Ill. 171.

· There was no evidence, at any time, of the written appointment of Sweet as agent of this company. Nothing was shown at the time the policy was written, as to the extent of his powers, but he was clothed with all the symbols of an unrestricted agency. The jury were therefore to decide on the fact and the extent of his agency, by what he testified and did, coupled with the acts of Maguire recognizing him. *Nicoll* v. *Am. Ins. Co.* 3 Woodb. and Minot, 529. He did not inform Maguire his jurisdiction was limited to Nebraska; he did not, so the jury say, inform him his application must first be submitted to the general agent; he did not refuse to accept the preliminary proofs of loss, and he did not, as requested by the general agent, cancel the policy, but continued the risk, and never disclaimed authority to do so, but assumed it; and finally, in a letter to the general agent, written after the fire, he expressed regret for the loss—that the distillery was insured under policy No. 320 in the Ætna for $2,500, and in the Phœnix for a like amount, and an adjuster was actually sent out to adjust the loss.

There is too much proof in this record for appellants to withstand. The jury have found all the controverted facts, and we think correctly, in favor of appellees, and they must have their due weight on this appeal.

In conclusion we would remark, on this question of cancellation under the fifth condition of this policy, that there can be no cancellation unaccompanied by a return of the unearned premium. It is not sufficient for the company to say, your money is ready for you, subject to your order. The act of refunding and cancellation must be simultaneous. There is no obligation resting upon the assured to dance attendance at the place of business of an insurance company, and await their pleasure. They know when they determine to cancel a policy, and, forthwith, with their determination, they should tender the unearned premium. Until that is done, there can not be, as we

understand the fifth condition, a cancellation. *Peoria M. & F. Ins. Co.* v. *Botto*, 47 Ill. 516.

Another objection is made, but not argued, that the suit was prematurely brought. In answer to this, it is sufficient to say, the time at which the suit was brought was not in evidence. But waiving this, the fair understanding of this condition of the policy seems to us to be, that when the company agree to pay the loss, or are undecided what they will do, no suit can be brought until after the expiration of sixty days from the time proof of loss is furnished, but it can not apply, nor would it be just that it should, to a case where a company peremptorily refused to pay, as was this case.

We are of opinion the court properly disposed of the instructions. They fully met, as given by the court, the law of the case, and the justice of the case is manifestly with appellees.

The judgment is affirmed.

*Judgment affirmed.*