THOMAS H. McGRAW v. GERMANIA FIRE INSURANCE COMPANY.

*Fire insurance—Agency to obtain policy—Proofs of loss—Private examination on oath—Cancellation.*

1. Where proofs of loss were made by an agent of the assured the latter, in a suit upon the policy, in which the proofs were introduced without objection was properly allowed to testify that he had given the agent authority to act in all respects as he himself would, with reference to the proofs.

2. Where a fire insurance policy requires proofs of loss to be made out

---

and sworn to by the assured before he can realize upon the policy, such proofs are a condition precedent; and *it seems* that the assured must make them out himself or show good reason for not doing so and for leaving them to be made out by an agent. And in a suit upon the policy the plaintiff has the burden of proof that the case is within the exceptions to the rule which requires the proofs to be made out by the person assured.

3. A ruling is presumed to have been supported by evidence if all the evidence does not appear in the record.

4. A stipulation in a fire insurance policy that the assured, in case of loss, shall, *if required*, submit to a private examination, is, if valid at all, so clearly opposed to the general policy of the law that no intendments will be made in pursuance of it; and where the assured person or his agent was notified that the company *desired* such an examination the letter containing such notification was properly excluded from evidence, as it was not in strict accordance with the stipulation.

5. Testimony as to what was done with reference to cancelling a fire insurance policy was properly excluded in an action on the policy where the premium was not returned until the loss actually occurred.

6. A person applied for insurance to certain agents. The latter could not place the whole amount in companies which they themselves rep-

---

Mullett, then you will undertake to find from the evidence in this case where that line ran.

6. It appears that in the year 1851, some 11 years after the original survey, a man by the name of Whicher made a survey and laid out a village plat, and it is claimed on the part of the plaintiff that that survey, having been made at an early day, and so shortly after the government surveyor had completed his work, such plat should have greater weight with you than that of any subsequent surveyor. If you find that at the time the Whicher survey was made these government monuments existed, or that at that time there were a greater number of government monuments and marks than there were at the time the subsequent surveys were made, then it may be entitled to have greater weight with you; but if no more monuments existed at that time than at the time of the subsequent survey, then its antiquity will give it no greater weight than that of the subsequent survey.

7. It is claimed on the part of the defense that in the absence of any monument, as section corners or meander stakes upon this line, then that the true method of finding the line is to commence west at the corner between sections 31 and 30, running the line to the quarter post, which is an established monument, taking that course and then projecting that line past the east line of section 31, would form the line, the southern boundary of section 29; that it would be established. In this view of the case I do not fully accord, and while you will take that into consideration as to whether or not that line should be projected in that manner, yet lines are so frequently changed in direction from one government monument to another, that it is not conclusive evidence as to where the Mullett line was run.

8. It is also claimed on the part of the defense that in the absence of any monument being found, and in the absence of your being able to determine where those monuments were originally located, then a line

resented, and went therefore to another agent from whom they obtained the rest, making certain verbal representations to him as to the condition of the property to be insured. The assured had nothing to do with these negotiations. *Held*, in an action on a policy thus obtained at second hand, that the persons obtaining it were agents of the insurer rather than of the assured, and that their verbal representations, if false, could not avoid the policy.

7. Where the effect of a written contract will depend upon contemporaneous verbal representations made by a third person, he must be an actual agent or his action must be ratified with knowledge of what he has done.

Error to Bay.   (Green, J.)   April 22.—June 18.

ASSUMPSIT.   Defendant brings error.   Affirmed.

*Hanchett & Stark* for appellant.

*Isaac Marston* for appellee.

CAMPBELL, J.   So far as the questions raised in the record refer to the proofs of loss, and the attempt at cancellation, we

---

drawn from the known monument west the quarter stake between 30 and 31, to the section corner between 25 and 36 on the east line of the township, would form the true line bounding the south of section 29. This would be but to magnify the possible errors that I have mentioned that might occur in running the line in accordance with the direction of the section corner on the west to the quarter post, and would not be a safe guide to go by.

9. The statute prescribes the manner in which lost interior corners should be found.  In this case none of the surveys conformed to the requirements of the statute in finding these corners.

10. The section corner in question may be determined by the evidence of men who knew where that section corner was; but in determining whether they knew the fact as to where the section corner was, you will take into consideration their means of knowledge, the length of time that has transpired since they observed it, and their liability to be mistaken as to the true section corner, where two corners have been established, one the original and the other the re-survey.

11. It is claimed on the part of the plaintiff that the defendants having platted a portion of the village of Cheboygan upon the lines surveyed by Whicher, is evidence to be considered by you that the Whicher line is the true section line as surveyed by Mullett.  Upon this point, gentlemen of the jury, I charge you that the platting of the village of Cheboygan by these parties does in no way govern or control the rights of these parties in this suit, as it does not affect the property in question.

12. If you find that the section line of Mullett is on a line with what is claimed is the meander post on the margin of the Cheboygan river, the plaintiff is entitled to recover.

13. The question for you to determine in this case is, where was the Mullett line, if such a line was ever run; and where that is found, the rights of the parties in this case are determined by you.

concur in the results arrived at by Judge Champlin, that there is no error.    But we think there is no error in the rulings depending on the supposed agency of the firm of Knaggs, Clark & Plum, under which the court below properly, as we think, excluded any responsibility against McGraw for what they may have done or omitted.

It is certainly worthy of some consideration how far those questions could be raised at all under the facts as shown by defendant.    The policy in suit, if valid, covered a loss under a previous fire to the one now in question.    The defendant's agent, Mr. Stringham, examined the property and risks, and advised the company, who determined and attempted, not to repudiate the entire policy, but to cancel what was left of it; and the various notices which they gave, and the steps which they took, were inconsistent with any claim of its invalidity. If they proposed to repudiate, they could not treat it as good so far as premiums were concerned, and bad as to liability. It does not appear, but the inference is otherwise, that the first loss was treated as not binding defendant.    The premium offered to be returned was only a portion of that paid for the whole period.    Such a transaction would seem to be an affirmance, as far at it is significant at all; and there was never any attempt at rescission.    But, as we do not know how far this matter may have been viewed below, we do not propose to do more than refer to it as an element which might have been significant if the other rulings were doubtful.

But so far as the relations of McGraw with Knaggs, Clark & Plum become important, we do not think they involved such agency as defendant claims.    The testimony tended, in our opinion, to prove distinctly that as between McGraw and that firm they represented the insurers and not him.    He, by his agent, applied to them for insurance, and in answer to that application obtained the insurance.    He paid them all the premiums required on all the policies, and they receipted for the whole in one receipt, and without other discrimination than separating the items belonging to the several policies. He did not become responsible for their compensation.    There was nothing tending to show that any one but Mr. Curtiss and

Mr. Birdsall had authority to represent him.   From the business in which this firm was engaged no one would have a right to suppose that they could possibly have personal knowledge of the exact condition of all property that they got insured, or that any policy valid on its face could be fairly charged with their failures in representations.   If the policy in suit had been issued on written representations, those would no doubt have formed a part of it, if referred to, and there could then have been no ambiguity about the contract.   But where the effect of a written contract is made to depend—if this can legally be done in all cases—upon contemporaneous verbal representations, those must, in our opinion, be made by an actual agent, or one whose action is ratified with knowledge of what he has done.   We can see no good reason in law for applying to insurance business any different rules of agency from those which apply elsewhere.   No one could contend that these persons were McGraw's agents in those insurances which were obtained from their own companies, although insurance policies sometimes attempt to put their agencies in this anomalous position, as binding the insured in all cases where their conduct might prejudice him, and only representing the company where it will benefit the company.

The companies always have it in their power to have everything material reduced to writing.   It is contrary to general practice in other cases to have an agreement partly in writing and partly in parol.   If this can lawfully be done, as perhaps it may be, it must nevertheless stand as written, unless varied by authority, and an assured party is not bound to inquire how far unauthorized persons have undertaken to represent him in matters of which he has no notice.   The policy refers to property fully identified.   He could not be bound to assume or imagine that anything further had been represented about it, except by his own agents, of whose acts he is bound to inform himself.   No one would be safe in taking out insurance under any other rule.   The insured has a right to know where he stands, and while he takes the risk of his own representatives, he cannot be subjected to those of persons whom he has never appointed or recognized.

If we thought there was anything tending to show that Clark and his firm were plaintiff's agents, we could not pass upon the weight of testimony ; but we think there is nothing from which any such inference could be raised.

The judgment must be affirmed.

COOLEY, C. J. and SHERWOOD, J. concurred.

CHAMPLIN, J. (dissenting).   This is an action of assumpsit brought by plaintiff to recover damages upon a policy of insurance.

On the 21st of April, 1882, the plaintiff and one Charles Wartrous were copartners, composing the firm of T. H. McGraw & Co., which firm were the owners of some eighteen million feet of pine saw-logs, then cut and skidded in Bay county, Michigan.   The firm had in their employment one Charles C. Curtiss, who was the superintendent of T. H. McGraw & Co. in looking after their affairs generally, and had entire charge of their insurance business.   The partners resided in the state of New York, but they had a place of business and an office at Portsmouth, in Bay county, Michigan.

About the 21st of April, 1882, Curtiss called upon Messrs. Knaggs, Clark & Plum, a firm of insurance agents in Bay City, and requested insurance for T. H. McGraw & Co. upon their saw-logs to the amount of one hundred thousand dollars. They informed him that they did not know what amount they could take, but would write to their companies and ascertain, and take what they could.   The Hanover Fire Insurance Company and the Germania Fire Insurance Company were doing business in this State, and were insuring property against loss or damage by fire under what they denominated " Underwriters Policy," and they had an agency at Bay City, and were represented there by Daniel Shannon.   The firm of Knaggs, Clark & Plum did not represent the Underwriters, but they applied to Shannon and placed a portion of the risk applied for by T. H. McGraw & Co., through Curtiss, in companies represented by Shannon ; and they afterwards delivered

to T. H. McGraw & Co. policies of insurance upon their logs to the amount of fifty thousand dollars, of which the policy in suit was one. Curtiss had no dealings whatever with Shannon, with reference to the issuing of the policy or the risk covered thereby. He paid Messrs. Knaggs, Clark & Plum the premium upon all the policies received from them, including the policy in suit ; and at or previous to applying for the insurance he made no written application, and made no verbal representations, as to the exposure or risk to fire of the property insured.

On May 6, 1882, a fire occurred which burned a portion of the logs. Notice was given to the companies of the loss, and adjusters were sent, representing all the companies, defendant included, to adjust the loss, and the adjuster representing the defendant company made out and forwarded to his company proofs of such loss.

On May 9, 1882, Wartrous sold his interest in the firm of T. H. McGraw & Co. to his copartner ; and on the 24th of the same month Daniel Shannon, the agent of the Underwriters, indorsed the following consent upon the policy in question, viz.: "The insurance companies within named hereby consent that the interest of Thomas H. McGraw & Co., in the within policy, be assigned to Thomas H. McGraw, subject to all the terms and conditions therein mentioned and set forth." On the same day Curtiss signed the firm name of T. H. McGraw & Co. to the indorsement on the policy, as follows : "For value received, we hereby assign, transfer and set over to Thomas H. McGraw all our right, title and interest in and to the within policy, and all benefit and advantage to be derived therefrom."

The defendant sent Joseph H. Stringham to ascertain the amount of the loss occasioned by the fire of May 6th. He adjusted the loss for defendant, and made report thereof to the state agent of defendant on the 20th or 21st of May. He testified that there was a great deal of forest exposure ; that it was right in the woods where the logs were skidded ; that there had been timber cut away more or less, and that there was a great deal of exposure all around ; that there was

stuff lying around on each side of the road that would feed a fire, very close to the logs; that it was cleared away a little more around the logs than it was elsewhere, but the space was not wide enough to furnish protection; and that he knew nothing at that time of the circumstances under which the insurance had been obtained; that the surrounding forest exposure very greatly affected the risk. And it appeared from the evidence of Charles C. Gardner that no clearing around the skidways had been done prior to the 30th of April, and that before then the ground was in its natural condition as woods around the skidways, with the leaves, bark and refuse stuff upon the ground.

It appears that on May 29th the defendant telegraphed to its agent Shannon to cancel the policy in question, and that Shannon went to plaintiff's office and saw Curtiss, and told him he wished to pay the losses for the companies represented by him except the Underwriters, and made an appointment to meet Curtiss at Shannon's office; that a little after 11 o'clock A. M. they met, and Shannon then showed Curtiss the telegram, and told him that the Underwriters had ordered him to cancel the policy; that it would facilitate matters to cancel the policy over his counter; but as the business had been placed through Knaggs, Clark & Plum through courtesy, he would go to them and have the policy canceled; that Curtiss replied that he thought it was all right,—he would hold the policies for the present.

On the same day, Shannon computed the amount of the unearned premiums upon this policy and others, and wrote and delivered to one of the firm of Knaggs, Clark & Plum a letter requesting them to cancel the policy in suit, with others, and in this letter he stated that he inclosed a check for the return premiums, but the check was not inclosed. When the letter was delivered to Mr. Clark, of the firm of Knaggs, Clark & Plum, he was told that the check was not inclosed, but if he would call at Shannon's office in the course of an hour he would receive the currency, which he promised to do, but did not do so. On the 30th of May, Shannon made several efforts to see some member of the

firm of Knaggs, Clark & Plum, for the purpose of paying the return premium, but it being a legal holiday, commonly called " Decoration Day," he failed to find them at their office.

On the 29th of May a fire started about forty rods from any of the logs covered by the policies of insurance, and spread over the ground until it reached the logs, which it did on the afternoon of May 30th, running through pine tops, brush and refuse upon the ground where the timber had been cut. There was refuse stuff upon the ground which fed the fire right up to the logs, and ran along the railroad track for a mile and a half, where the logs were piled, burning that distance over the ground, and as it passed along it caught in the logs at the different rollways, and burned them. The prevailing timber in the woods, in which the logs were skidded, besides pine, were oak, ash, cedar and hemlock. Timber had been cut in lumbering all through the woods in the immediate neighborhood of the skidded logs, and around where they were skidded, leaving the tree-tops on the ground, except what had been cleared away around the skidways, from sixty to a hundred feet, and the clearing of this distance was not much protection if the fire got burning. The fire became very large, and covered a territory of two miles in length and a mile in width, and burned the logs in four places, from one-half to three-fourths of a mile apart. From the 6th of May to the 30th, fires had been burning in the neighborhood of the logs all the time, and the men had been fighting such fires all the time. Fires had occurred as early as the 26th of April, and had burned some of the logs; and from the 26th of April to the 30th of May fires were burning continuously. The fire of May 30th occasioned a large loss to the property insured, and notice thereof was given to the agent of defendant on the morning of the 31st, and afterwards proofs of loss were prepared and sent to the general agent of defendant at New York on the 17th of July. These proofs were sworn to by one Birdsall, whom the plaintiff authorized to prepare proofs of loss, and to verify the same.

On or about the 8th day of August, one R. H. Garrigue,

an agent of the defendant company, and one Gould, an attorney of the company, came to Bay City, and wrote and addressed to T. H. McGraw & Co., at Portsmouth, Michigan, a letter, which he caused to be delivered at Mr. McGraw's office (plaintiff lived at Poughkeepsie, New York, but had a business office at Portsmouth); that, following the delivery of the letter, Mr. Curtiss appeared at the room designated in the Fraser House, with the letter, and an interview there occurred between Mr. Curtiss, Mr. Garrigue, and Mr. Gould. At this interview the proofs of loss were present, and in the conversation one of the parties told Mr. Curtiss " that those proofs were unsatisfactory; that in fact they were not proofs, because they were not signed and sworn to by the assured." They did not return the proofs to Mr. Curtiss for the purpose of having them corrected in that respect, nor offer to return them, but took them away when they went. No other objection was ever made to the proof. The loss not having been paid, suit was brought against the company upon the policy, the action tried, and verdict rendered for the plaintiff.

Upon the trial the plaintiff testified in his own behalf, and was asked the following question : " What did you say, if anything, to Mr. Birdsall with reference to those proofs of loss before leaving ?" This was objected to by defendant's counsel as immaterial. The objection was overruled and the witness testified : " I gave Mr. Birdsall the authority to act in all respects as I would do if I were to remain, in connection with this insurance matter." The proofs of loss had been introduced in evidence without objection, signed by Thomas H. McGraw, by Ben Birdsall, his attorney, and were verified by him; and the evident object of the question was to show that the act was done by plaintiff's authority. The evidence called for was material, and the ruling proper.

The record discloses the fact that the plaintiff was at Bay City both at the fire of May 6th and May 30th, and that he gave no notice to any insurance agents himself, and that he was not here at the time the proofs of loss were made out.

The proofs of loss themselves do not disclose any reason why they were not signed and sworn to by the assured. The clause in the policy referring to this matter reads as follows : " The assured shall forthwith give notice of said loss to the companies through their general agent, in the city of New York, and, as soon after as possible, render a particular account of such loss, signed and sworn to by them," etc. Based upon this clause of the policy the defendant's counsel requested the court to charge the jury as follows :

" The policy requires the plaintiff, Thomas H. McGraw, to make out in writing proofs of his loss, and sign and swear to them himself, and send or deliver them to the defendant; and if he fails to do that he cannot recover from the defendant. In case the plaintiff has failed to show that he made and furnished to the defendant such proofs of loss in regard to the second fire, for that reason he would not be entitled to any recovery on account of the second fire."

Under the policy in question, proofs of loss required by its terms are a condition precedent to a right of recovery; and in general they are to be signed and sworn to by the assured in person. But the clause in question is subject to exceptions; as where the owner is a non-resident, dead, or was insane or absent at the time when the loss occurred, and did not return in season to make the proofs, or did not possess the necessary information in reference to the matters required to be stated, to make proofs, or that the objection as to their being made by the wrong person has been waived. See Wood on Insurance § 413. But where the assured can himself make the necessary proofs he should do so, or give a sufficient excuse for his failure; and ordinarily (though this is not essential) the reasons why the proofs were not made by the assured should be stated in the proofs of loss.

The first inquiry presented is, does the present case come within any of the exceptions which authorize the proofs to be made by any other person than the assured ? In such case the burden of proof is upon the plaintiff. The record discloses the fact that the plaintiff is a non-resident of the State; that he has a place of business at Portsmouth, near Bay City,

Michigan ; and that his business is carried on through Mr. Curtiss, his superintendent there. The insurance was obtained through his agent, and proofs of loss were made by another agent, expressly authorized. But the record fails to disclose any sufficient reason why the plaintiff did not make the proofs, or why Birdsall was the proper person to make them ; and if the record contained the whole evidence upon this point I should have no hesitation in saying that this condition precedent of the policy had not been complied with. The record, however, does not purport to give the whole testimony upon the whole case or any branch of it, and counsel for plaintiff invokes the well-settled rule of this Court, that the presumption is that the ruling of the court below was correct, and that there was evidence to sustain it. *Wicks v. Ross* 37 Mich. 464; *Hall v. Johnson* 41 Mich. 286 ; *Brong v. Brown* 42 Mich. 119 ; *Cummins v. People* 42 Mich. 142. It must therefore be presumed that it was made to appear at the trial that the proofs of loss were properly made by the agent of the assured. Counsel for defendant calls attention to the fact that in the interview of August 8th, between the State agent of defendants and Mr. Curtiss, he was informed that the proofs were not sworn to by McGraw, and that they were not satisfactory, and were not proofs. But the position then assumed by the State agent was based upon the literal reading of the policy, and recognized no exceptions, whereas within the terms of the policy and intention of the parties, the clause in question includes under particular circumstances other persons than the assured, within the spirit of its provisions, as proper parties to make the required proof ; and as before stated, the evidence at the trial is presumed in support of the charge and verdict to have satisfactorily established the validity of the proofs made.

R. H. Garrigue testified in behalf of defendant that he was defendant's state agent for Michigan, and came to Bay City on the 6th or 7th of August, and wrote to Thomas H. McGraw or Thomas H. McGraw & Co., at Portsmouth, Michigan, from room 78, Fraser House, and sent it to Mr. McGraw's office

at Portsmouth; that Mr. Curtiss responded to the letter, coming to room 78, and brought the letter with him; that Mr. Gould was present in the room at the same time. The letter was offered in evidence by defendant's counsel. It reads as follows:

"Bay City, Mich., August 8th, 1882.

*T. H. McGraw & Co., Bay City, Mich.*—Dear Sirs: As a further answer to your letter of July 28th, not included in my letter to you of August 1st, I would say that I am instructed by the general agent of the Germania and Hanover Fire Insurance Companies not to admit any liability under policy 20,300, nor waive any of the companies' rights under the terms and conditions of said policy, but to investigate all the facts in the case, and report to him, when he will submit the same to the board of management for their action. The companies have requested Mr. Geo. D. Gould to examine you under oath, or some person authorized to give answers for you.

The companies also desire a statement from your agents and brokers, Messrs. Knaggs, Clark & Plum, in relation to procuring the insurance. Please inform me at room No. 78, Fraser House, this city, when you can appear for such examination.

Yours truly,     R. H. Garrigue, State Agent."

The offer was made for the purpose of showing the steps taken to obtain an examination of Mr. McGraw under oath. Counsel for plaintiff objected to its reception for the reason that it stated no time or place, and it did not appear that it ever came to Mr. McGraw's knowledge. The court sustained the objection and excluded the letter.

It was stipulated in the policy that the assured should, if required, submit to an examination under oath apart from all other persons except the attesting magistrate or notary, by any person appointed by the companies, and if deemed necessary by the companies, to a second examination, and subscribe to such examination when reduced to writing. By another clause of the policy it was provided that until such examination was permitted the loss should not be payable.

The provision for an examination apart from all other persons except the attesting magistrate is very unusual and

extraordinary, and one liable to abuse, and to give to the insurers an unfair advantage. It is very questionable, indeed, whether such a stipulation is not void as against public policy. It certainly is antagonistic to the policy of our laws relating to contracts of insurance, and to proceedings of a judicial nature. The policy of our laws relating to the contract of insurance is to place the parties thereto upon an equal footing with respect to the assertion and determination of rights under it, and to secure fairness and equity between the insurers and the assured. Act No. 149 of 1881. It does not partake of the quality of fairness or equity to compel the assured to submit himself to an ex-parte secret examination, deprived of the aid of counsel to see that the rights of the assured are not jeoparded, or be led into making admissions or statements which he did not intend to make, or which, from the manner in which they are drawn out, fail to express the facts in their true light. The examination is to be had before a magistrate or notary; and although the proceeding is not in a strict sense judicial, yet it is quasi judicial in its nature. An oath is administered by a person having authority to administer oaths; the statements are reduced to writing, and are to be subscribed by him. They thereby become the sworn admissions of the party, and as such are admissible as evidence against him. In the secret chamber where the examination is carried on he may claim that his statements are not correctly written down, or that he has made statements qualifying those written down which the magistrate has failed to note, and he may object to sign such as are written. He is there surrounded only by the magistrate and agents of the company as the only witnesses he can produce of what occurred in their presence. It is true that the party may go upon the witness stand at the time of trial and contradict the statements, or swear he never made them, and the manner in which the statements were obtained, and the credit which should be given to them will be for the jury to determine; but if between the time of such examination and trial the person examined should die, there could be no explanation or contradiction. The sittings of all courts

in this State are required to be public, and it is the privilege of any citizen freely to attend the same. How. Stat. § 7244. The law allows the depositions of witnesses in the State to be taken, to be used in suits in this State, but it requires notice to the adverse party, and the oath must be publicly administered to the witness. How. Stat. §§ 7434, 7439. The law also provides for the taking of depositions to be used in the trial of causes, but only upon notice to the adverse party, whose privilege it is to be present and cross-examine if he chooses to do so. How. Stat. § 7459 et seq. Provision in this statute is also made for taking and perpetuating testimony before suit is commenced, and under this provision defendant might have examined the party or any witness it desired, but such examination under the law must be public and upon notice. How. Stat. §§ 7476, 7477. The act of March 17, 1881, (Pub. Acts 1881, No. 36,) authorized any justice of the peace to issue subpœnas to compel the attendance of witnesses before the president, etc., of mutual fire insurance companies organized under the laws of this State, and to give evidence before them touching the adjustment or arbitration of losses; but notice to the opposite party interested in such adjustment, of the time and place of such examination, was required to be given, and he could appear either in person or by attorney and cross-examine the witnesses. Hence it appears that the policy of the law favors public proceedings in matters of examinations partaking of the nature of judicial inquiry.

But while I do not feel called upon to declare the stipulation void for the reasons suggested, the party seeking to enforce such extraordinary provisions as a defense to an action upon the contract, must bring himself within the strict letter of the clause relied on. The requirement ought to be so definite in its terms, and certain as to time and place for the party to appear, as to put the assured in default if he failed or neglected to comply. But it is not contended by the counsel for defendant that the letter alone would have been sufficient to bar plaintiff's right of recovery, and counsel avowed his object in offering it to be to show the steps

taken to obtain an examination of Mr. McGraw under oath. If the writing and sending this letter was the only step taken, it was wholly immaterial, and counsel made no proposition or effort to show any other steps taken in that direction, except to show what was said in the interview between the agents of defendants and Mr. Curtiss at the Fraser House, when he appeared in response to the letter, in which interview it is claimed Mr. Curtiss was informed of the desire of the company to examine Mr. McGraw, and if he could not be examined, to examine Mr. Curtiss in his place. I do not think the contents of the letter tended to throw any light upon a substantive requirement or demand that Mr. McGraw should submit himself to a personal examination. In itself, it was insufficient for the purpose of a demand upon which to base a claim that plaintiff had not a right of action upon the contract until he did submit to be examined; and if not sufficient for that purpose, it was not admissible for any other.

The defendant had been permitted to show a letter had been written to T. H. McGraw & Co. and delivered at their office in Portsmouth, and that Mr. Curtiss appeared at room 78, Fraser House, in response thereto. This was sufficient to lead up to the interview with Mr. Curtiss. The letter was rightly excluded; and thereupon counsel for defendant put to the witness Garrigue this question: "I renew my question as to what took place between you and Mr. Curtiss at that time in regard to the examination of Mr. McGraw under oath in regard to this insurance?" which was objected to as wholly immaterial. Counsel for defendant thereupon announced: "The purpose is to show the interview between the witness and Mr. Curtiss in which Mr. Curtiss was informed of the desire of the company to examine Mr. McGraw, and if he could not be examined then to examine Mr. Curtiss in his place." He also stated that he claimed the right to the examination under the policy.

Under the proposition of counsel the question was subject to the same criticism as the letter. It was not proposed to show a requisition or demand that the assured submit to an

examination, but simply the desire of the company there-
for.  The agreement was not that the assured would submit
to an examination if desired, but if required.  Under the
view I take of the extraordinary character of this stipulation,
and the doubts I entertain respecting its validity, I think the
offer should not be extended by intendment to embrace what
the strict letter of the contract requires.  The court was
right in excluding the testimony under the offer as made, and
in refusing the defendant's fifth request to charge the jury,
based thereon.

Daniel Shannon was produced and sworn as a witness for
defendant, and testified that he resided in Bay City, and was
the agent of the Germania Insurance Company and the
Hanover Fire Insurance Company, the Underwriters' com-
panies, in April and May, 1882.  That he issued the Under-
writers policy put in evidence in this case; that it was signed
by him as agent at or about this date; that J. W. Knaggs,
of the firm of Knaggs, Clark & Plum, applied to him for
the insurance on the 21st day of April; that at that time he,
the witness, had no knowledge of the risk of the logs in
question, or of their situation personally; that Mr. Knaggs
described the logs and the risk to him; that he, the witness,
had no knowledge aside from the information obtained from
Mr. Knaggs; that he did not go to the woods at all.

The defendant's counsel thereupon asked the witness the
following question:  "What representations were made
to you by Mr. Knaggs in regard to the risk, and the situ-
ation and exposure?"  The defendant's counsel offered
to show that Knaggs then stated that there was no forest
exposure; that the logs were then skidded upon ground
which had been burned over the year before, and were in a
clearing, and there was no forest exposure around them
except occasionally a scrub oak; and in reliance upon that
representation Mr. Shannon made the insurance, and that
the representations were false.  The question was objected to.
The defendant's counsel claimed that under the facts testi-
fied to by Curtiss, Mr. Knaggs did act as the agent of T. H.

54 Mich.—11

McGraw & Co. in procuring this insurance; and so acting, any representations which he made affecting the insurance were the representations of McGraw & Co. The evidence showed, as appears from the record before us, that this policy of insurance was obtained in this manner: Curtiss had entire charge of T. H. McGraw & Co.'s insurance matters; that he applied to a firm of insurance agents at Bay City for $100,-000 of insurance on the logs insured; that they said to him they did not know what amount they could take, but would write to their companies and ascertain, and take what they could. The insurance was furnished to the amount of $50,000 in twelve different companies; more than one half of the amount, or $27,500, having been obtained through the companies represented as agent by the witness Shannon, viz.: in the Underwriters for $15,000, Lion for $5000, Amazon for $2500, Metropole for $2500, St. Paul for $2500. Curtiss received these policies from Knaggs, Clark & Plum, and observed that they were countersigned by Shannon as agent at Bay City, and not by Knaggs, Clark & Plum; that when he made the application to them for insurance he did not know what companies they represented; that he knew some, but not all, and did not inquire of them; that he paid Knaggs, Clark & Plum for the whole amount of the premiums on the insurance; that after the fire of May 6th he reported the loss to Knaggs, Clark & Plum, and asked Shannon if it was necessary for him to report to the companies for which he had written policies. Knaggs applied to Shannon for the insurance, and aside from information obtained from him, Shannon had no knowledge or information on the subject of the risk.

I think there was sufficient evidence to submit the question of fact to the jury to determine whether Knaggs, Clark & Plum were the agents of the insured in obtaining the policy from the Underwriters. It was well said on the argument that they were not themselves insurers, and were not applied to as such. They were not applied to as agents of any companies. They were applied to as persons by whom insurance might be obtained. While the evidence shows

that they acted as agents for some companies, such companies were not all known to Curtiss, and his application was not limited to them. His application was for $100,000 of insurance, without reference to the companies which should take it. When the policies were delivered they showed upon their face that the insurance was in companies of which they were agents, and in companies in which they were not agents. The plaintiff had acted upon the policies, and had made and forwarded proofs of loss from the fire of May 6th.

All inferences from these facts were to be drawn by the jury, under proper instructions from the court; and it was competent for them to find from the evidence that Knaggs, Clark & Plum were agents of the assured in procuring the insurance in the companies represented by Shannon as agent. If they were such agents, the representations made by them in procuring the policies, as to the situation of the property and the risk involved, were binding upon the plaintiff, although no express authority was given to them to make such representations, because, by giving them authority to procure the insurance, he must be held to have given them power to do any act necessary to obtain such insurance.

It is contended by defendant's counsel that Knaggs did, in fact, act as the agent of Thomas H. McGraw & Co. in procuring this insurance; that he made representations in their behalf by means of which the insurance was obtained; that those representations were false and fraudulent, making the policy void when it was delivered to him, and when he delivered it to Thomas H. McGraw & Co., they, by accepting it, ratified his agency in procuring it; that they could not ratify his act in procuring it separate from the means by which it was procured, and make it a valid policy; that the law does not allow them to adopt what he procured by fraud and was favorable to them, and to repudiate the fraud; and that it was competent as against them, when they sought to enforce the policy, to show that it was procured by fraud, and was void.

On the other hand, it is contended by counsel for plaintiff that Mr. Curtiss did not know until after the delivery of the

policies that any application had been or was to be made to
Shannon to write policies; that it does not appear that he
gave Knaggs any authority to apply to any other agent;
that on accepting the policies he continued to deal with
Knaggs, Clark & Plum, and not at all with Shannon;
that it was not claimed that at the time of accepting the
policy, or up to the time of the fire, Mr. Curtiss was in any
way informed that any representations had been made by
Mr. Knaggs to Shannon at the time he made application for
this policy. Plaintiff admits that by accepting the policy
issued by Shannon he ratified the procuring thereof, so it was
binding on the company, but that it would not extend beyond
the fact of authority to procure a valid policy; that it would
not be a ratification of each and every act done or statement
made by Knaggs to procure it, unless knowledge thereof was
brought home to the principal, who would have no right to
assume that false and fraudulent statements had been made,
and he cannot, therefore, be presumed to ratify what, so far as
he can be charged with knowledge, never took place; that
the whole doctrine of ratification is based on an act done
*upon full knowledge of the facts.* And counsel for plaintiff
admits that the principal cannot ratify a part and reject a part
is familiar doctrine, but insists that in this case the only rati-
fication is the taking and retaining the policy, with no knowl-
ledge of the alleged representations until after the loss; and
that a principal ratifying that which was within the range of
his intended instructions, does not ratify acts on the part of
his agent of which he is not informed.

I think the principle which should control this case is well
stated by Mr. Justice Redfield in *Fitzsimmons v. Joslin* 21
Vt., at page 142. After reviewing the English authorities
upon the subject, he says: " The cases must revert and can
only find secure repose upon the old basis, that a contract
superinduced by substantial fraud entering into the very basis
and frame-work of the contract, and without which it would
not have been made, cannot be enforced against the party thus
misled, whether the fraud originated with the other party, or

his agent,—whether it were concerted by the principal, or adopted by him."

This principle is fully supported by the following authorities: Kerr on Fraud 111–114; *Baker v. Union Mut. Life Ins. Co.* 43 N. Y. 283; *Elwell v. Chamberlin* 31 N. Y. 611; *Presby v. Parker* 56 N. H. 409; *Garner v. Mangam* 93 N. Y. 642; *Bennett v. Judson* 21 N. Y. 238; *Veazie v. Williams* 8 How. 134; *Carpenter v. American Ins. Co.* 1 Story 57; *Mundorff v. Wickersham* 63 Penn. St. 87; *Coleman v. Stark* 1 Oregon 115; *Morse v. Ryan* 26 Wis. 356; *Anderson v. Thornton* 8 Exch. 425; Broom's Leg. Max. 798, 799, 837, 793; Bigelow on Fraud, 367; Whart. Ag. §§ 89, 90; *Robson v. Calze* 1 Doug. 228; *Concord Bank v. Gregg* 14 N. H. 331; *Doggett v. Emerson* 3 Story 700.

In the case of *Morse v. Ryan*, supra, the plaintiff sued upon a contract made with defendant, and the defendant offered to show that he was induced to enter into the contract by false and fraudulent representations. The evidence was objected to on the ground that there was no evidence that what was done by Robinson and Henry Ryan, a brother of plaintiff, who negotiated the contract, was done by authority from the plaintiff. The testimony was excluded. But this was held to be error by the Supreme Court. The Court said: " The plaintiff having ratified and affirmed the contract, he also ratified and affirmed the means by which it was obtained; and such ratification was equivalent to previous authority given by him. The doctrine of the law is well settled, that a principal cannot accept and enjoy the benefits of a bargain made by his agent, without at the same time adopting the instrumentalities by which the agent consummated it." And in *Wilson v. Tumman* 6 Man. & G. 236 (46 E. C. L.) Chief Justice Tindal said: " That an act done *for another* by a person not assuming to act for himself, but for such other person, though without any precedent authority whatever, becomes the act of the principal, if subsequently ratified by him, is the known and well-established rule of law. In that case the principal is bound by the act, whether it be for his detriment or his advantage, and whether it be founded on a

tort or a contract, to the same extent as by, and with all the consequences which follow from, the same act done by his *previous* authority." *State v. Perry* Wright 662.

If in this case we should regard the act of Mr. Knaggs in procuring this insurance for the plaintiff as an act done without any previous authority from plaintiff, yet when the plaintiff accepted the policy, and when he seeks to enforce its provisions in his favor by suit upon it, he ratifies the act of Mr. Knaggs, and adopts the contract as his own, and is bound by whatever Mr. Knaggs said or did as an inducement for defendant to enter into the contract as fully as if he had made the representations himself, although he was ignorant of what misrepresentations were made. It was held by Mr. Justice Story in *Carpenter v. Am. Ins. Co.*, above cited, that the misrepresentations made by an agent in procuring a policy are equally fatal, whether made with the knowledge or consent of the principal or not. The ground in each case is the same. The underwriters are deceived ; they execute the policy upon the faith of statements, material to the risk, which turn out to be untrue. The mistake is, therefore, fatal to the policy, as it goes to the very essence of the contract. *Augusta Ins. Co. v. Abbott* 12 Md. 348.

It seems to me that it would be an unjust and unwise limitation to engraft in the doctrine of the law, that the principal does not ratify acts on the part of his agent of which he is not informed ; and that he can ratify and enforce that part which is for his benefit, and reject that which is detrimental to him. Whatever exceptions may have been raised in cases where the agent has exceeded his instructions previously given, to exonerate the principal, they do not apply to cases of agency by ratification. If a third person, without any authority from another person, assumes to act for his benefit in making a contract, and he adopts such acts and accepts the contract, there can be no reason why such person so accepting should not be held to adopt all the acts and representations by which such contract was consummated. He is not bound to accept the acts of such third person, but if he does so he must accept them as a whole. In such case no question

of excess of authority can arise, for no authority was given, and the subsequent ratification or adoption is equivalent to a prior command to obtain the contract in the way and by the means it was in fact obtained. He cannot accept a part and reject a part. *Peninsular Bank v. Hanmer* 14 Mich. 208; *Widner v. Lane* id. 124; *Hutchings v. Ladd* 16 Mich. 493.

The policy introduced in evidence contained the following: " The application, survey, plan or description of the property herein insured shall be considered a part of this contract, and a warranty by the assured; and any false representation by the assured of the condition, situation or occupancy of the property, or any omission to make known every fact material to the risk, or any overvaluation or misrepresentation whatever, either in the written application or otherwise," shall render the policy void. It thus appears that the representations made as to the property, its risk and exposure, was a part of the application, and made by express terms part of the contract; and it was, furthermore, a part of the contract that if any false representation was made of the condition or situation of the property it should avoid the contract. When the plaintiff adopted the policy as the contract between them, he adopted this provision of the policy, and it was competent for defendants to show what representations were made by Mr. Knaggs when he applied for the insurance, with reference to the matters referred to in this portion of the policy, and then, if they could, to show that such representations were false. I am clearly of opinion that the court erred in excluding the testimony offered for that purpose.

Testimony was offered to show what took place with reference to the attempted cancellation of the policy. The provision of the policy relative to cancellation was that " the companies reserve to themselves the right, at any time and for any cause, to return the assured the unexpired premium pro rata, which shall have the effect to cancel and annul this policy." The record shows that the unexpired premium was not returned before the loss of May 30th occurred, and if the policy ever had validity, it was in force at that time. The testimony was properly excluded.

The judgment of the circuit court should be reversed, and a new trial granted.