The Commercial Union Assurance Co. *v.* The State, *ex rel.* Smith *et al.*

Filed Feb. 16, 1888.

---

No. 14,012.

## THE COMMERCIAL UNION ASSURANCE COMPANY *v.* THE STATE, EX REL. SMITH ET AL.

INSURANCE.—*Pleading.*—*General Averment of Performance of Contract.*—A general averment in a complaint upon an insurance policy, that the plaintiff has performed all the conditions of the contract on his part, is sufficient.

SAME.—*Proofs of Loss.*—*Waiver of Objections to.*—Where proofs of loss are delivered to the agent of an insurance company, and he denies the validity of the contract, or asserts that the policy has been cancelled, there is a waiver of objections to the proofs furnished.

SAME.—*Agency.*—*Agent of Company Not Agent of Applicant.*—One who is made the agent in this State, by written appointment, of a foreign insurance company, can not be regarded as the agent of an applicant who merely agrees with him that he shall place the insurance desired.

SAME.—*Private Instructions.*—The rule that private instructions do not bind a party dealing with an agent, unless he has notice of them, applies as well to contracts of insurance as to other contracts.

SAME.—*Parol Contracts of Insurance.*—*Authority of Agent to Make.*—*Non-Delivery of Policy.*—Where the agent of an insurance company has general authority to make contracts of insurance, such authority extends to parol as well as to written contracts; and where a parol contract is made, the risk begins at the time stipulated, although the policy be not delivered to the assured.

SAME.—*Repudiation of Contract.*—*Notice to Assured Necessary.*—Where an insurance company has knowledge that its agent has made a contract of insurance, with which it is not satisfied, and there are facts before such company apprising it that the assured rests on the contract, it can not

The Commercial Union Assurance Co. *v.* The State, *ex rel.* Smith *et al.*

cancel the contract without notice to the assured, and in the absence of notice it is liable in case of loss.

SAME.—*Misconduct of Agent.*—An insurance company must bear a loss sustained by the misconduct or disobedience of its agent, acting within the scope of his authority, rather than the assured, who has dealt fairly with him as such, without notice.

From the Henry Circuit Court.

*T. A. Logan, J. M. Brown* and *R. Warner*, for appellant.

*J. H. Mellett, E. H. Bundy, C. Cambern, T. J. Newkirk, B. L. Smith* and *W. J. Henley*, for appellees.

ELLIOTT, J.—There are three paragraphs of the complaint, but there is no substantial difference between them. They are all based upon a contract of insurance. A single objection is made to the third paragraph, and that is, that it does not aver that the plaintiff furnished the defendant with preliminary proofs of loss. The complaint does aver, however, that the relators performed all the conditions of the contract on their part, and this is sufficient. If a plaintiff elects, he may specifically plead a performance of the conditions, and if he does elect to do this, he is bound to specifically aver full performance; he is not, however, bound to pursue this course, for he may plead generally that he has performed all the conditions on his part, and if he does do this his complaint will be good. *Home Insurance Co.* v. *Duke*, 43 Ind. 418.

The material facts established by the evidence are these: From August, 1883, until August 22d, 1885, the appellant, a foreign insurance company, was doing business in this State. Its representative at New Castle was Robert M. Nixon. The trustees of the Soldiers' Orphans' Home, the relators in this case, applied to Nixon, through one of their number, for an insurance on the building under their control. Nixon at the time represented several other companies, and in four of these obtained policies for the relators. Subsequently, one of these companies, the Home Insurance Company of New York, declined the risk, and notified Nixon to cancel the policy.

The Commercial Union Assurance Co. *v.* The State, *ex rel.* Smith *et al.*

Nixon notified the relators, and the policy was surrendered and cancelled. The relators did not demand a return of the premium, but agreed with Nixon that he should obtain insurance in some other company for the time remaining after the cancellation of the policy issued by the Home Insurance Company, and for that purpose he retained so much of the premium as had not been paid over to that company. On the 24th day of July, 1885, Nixon, as the agent of the appellant, selected it as the company in which to insure the relators' property until the 12th day of April, 1887. On the day first named he entered upon the policy register of the appellant in his possession, as its agent, the following :

| No. Policy | Name and Residence of Assured. | Term | Commence't of Risk. | | | Expiration of Risk. | | | Am't Insured | Rate | Am't of Prem'm |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Day. | Month. | Year. | Day. | Month. | Year. | | | |
| 100,041 | Trustees Indiana Soldiers' and Orphans' Home, Knightstown, Indiana. | 21 Mt'hs | 12 | July. | 1885 | 12 | April. | 1887 | $5,000 | 1 per cent. | $29.17 |

" Five thousand dollars for three years upon their three-story brick building with slate roof, occupied as an asylum for feeble-minded children and as a soldiers' orphans' home, situated entirely detached on Soldiers' Home Farm in Rush county, Indiana, one and a half miles south of Knightstown, Indiana. Said building is heated by steam from boilers situated sixty feet north of building and below surface of ground, and is to be lighted by gas machine, the tank for which is to be forty feet from the building and seven feet under ground. Permitted to place $25,000 additional concurrent insurance. Permitted to light the building with coal-oil lamps until gas machine is ready, if lamps are filled and trimmed by daylight only."

On the same day he made his daily report of the risk to

the resident secretary of the company at Cincinnati, Ohio, signing it as the agent of the company. In this report he gave the number of the policy, the amount of the risk and the rate. He also gave a copy of the written part of the policy and the questions and answers usually propounded to and received from agents. His report also contained this statement:

"This risk begins to-day, July 24th, 1885. It dates July 12th, 1885, to make it expire (with the other insurance placed by me) April 12th, 1887—twenty-one even months."

Accompanying the report was a letter, in which the number, the amount of the policy, the amount of other insurance and other information were given the company. An incomplete policy of insurance was also read in evidence, but there was no delivery of it to the relators; it was retained by Nixon with the other policies. On the daily report of Nixon the following endorsements were made at Cincinnati: "Asylum for Feeble-Minded Children. Undesirable. Cancel. Rate too low. 25—7—'85."

The letter and report of Nixon were received at Cincinnati on the 25th day of July, 1885. Letters were written to Nixon July 25th, August 10th and August 20th. A cancellation mark was also placed on the policy at Cincinnati. None of these letters were answered. In each of them was a direction to Nixon to obtain a better rate or take up or cancel the policies. On the 22d of August, 1885, the company sent a special agent to New Castle to examine into the affairs of the agency at that place; the special agent discharged Nixon, took the policy in favor of relators from his possession, and sent it to Cincinnati to be cancelled. The trustee who had the management of the business of procuring insurance was notified of the refusal of the appellant to carry the risk, but this notice was not given him until after his removal from office and after the company's agent had knowledge of that fact. No notice was given to any other trustee. The building which the contract of insurance described was

totally destroyed by fire on the 21st day of July, 1886.   On the 7th day of August of that year one of the trustees took with him sworn proofs of the loss and delivered them to John W. Eggleston, then in charge of the office of the resident secretary at Cincinnati.   Subsequently, this trustee met Mr. Holman, the resident secretary, and the latter asked him to withdraw the proofs, saying that, " as there was no liability of the company, he did not want to consider the proofs of loss." At another time, and while on a visit to this State, the resident secretary also denied that there was any liability on the part of his company.   On the 5th day of October, 1886, written objections to the proofs of loss were delivered to the relators.

There was a waiver of objections to the proofs of loss. Where proofs are delivered to the agent of an insurance company, and he denies the validity of the contract or asserts that the policy has been cancelled, there is a waiver of objections to the proofs furnished.   There is, indeed, in such cases a complete waiver of proof.   *Ætna Ins. Co.* v. *Shryer*, 85 Ind. 362, and cases cited; *Indiana Ins. Co.* v. *Capehart*, 108 Ind. 270; *North British, etc., Ins. Co.* v. *Crutchfield*, 108 Ind. 518; *Lebanon Mut. Ins. Co.* v. *Erb*, 112 Pa. St. 149; *King* v. *Hekla Fire Ins. Co.*, 58 Wis. 508; *O'Brien* v. *Ohio Ins. Co.*, 52 Mich. 131; *Tayloe* v. *Merchants' Fire Ins. Co.*, 9 How. (U. S.) 391.

Nixon was the agent of the company, and not of the relators.   This, we think, both the contracting parties must have clearly understood; at all events, there can be no doubt that the appellant treated him as its agent from the time of his employment until his final discharge.   We assume as clearly proved the fact that he was the agent of the company and that he was so regarded by its officers, and we think that the evidence fully justified the inference that the relators dealt with him as the appellant's agent.   He was made the agent of the company by written appointment, and as such he acted, so that the natural inference is that the re-

lators did not deal with him as their own agent, but as the agent of the companies which issued the policies of insurance. The mere fact that one of the trustees agreed with Nixon that he should place the insurance did not make him the agent of the board, for the agreement was with him as an insurance agent and in that representative capacity. Such agreements, courts judicially know, are usually made with insurance agents in their representative capacity, and what the agent does is done as the representative of the company, and not as the agent of the applicant for insurance. The services he performs in connection with the contract of insurance, he performs as the agent of the company. This is essentially so where, as here, the principal is a foreign insurance corporation. The case of *Phenix Ins. Co.* v. *Allen*, 109 Ind. 273, illustrates the principle on which we proceed. There, the agent inserted a false description in the application, and it was held that the company was bound by his act. The court, in the case of *Commercial Fire Ins. Co.* v. *Allen*, 1 South. Rep. 202, in discussing a question very similar to that here under immediate examination, said: "He was the agent of the insurance company, and we have no sympathy with any attempt to transform him into an agent of the applicants in any service connected with the issue of the policy. With him alone the assured had dealings; and it would be an anomaly if we were to hold he was their agent, and not the agent of the insurance company with which they were negotiating. If he did not represent the corporation, it had no representative, and yet agreed to the terms of a solemn contract. Such shifting use of a paid employee finds no sanction in that sturdy morality which should underlie every system of jurisprudence." The principle we assert is declared and enforced in these cases: *Piedmont, etc., Life Ins. Co.* v. *Young*, 58 Ala. 476; *Insurance Co.* v. *Wilkinson*, 13 Wall. 222; *DeLancey* v. *Insurance Co.*, 52 N. H. 581; *Rowley* v. *Empire Ins. Co.*, 36 N. Y. 550; *Putnam* v. *Home*

*Ins. Co.*, 123 Mass. 324; *McGraw* v. *Germania Fire Ins. Co.*, 54 Mich. 145.

The authorities go so far as to hold, that a recital in the policy that the person who obtains the policy shall be deemed the agent of the assured is not conclusive. The cases, indeed, go beyond this, for they go to the extent of holding that an insurance broker is not to be deemed the agent of the assured merely because it is so recited. *Indiana Ins. Co.* v. *Hartwell*, 100 Ind. 566; *North British, etc., Ins. Co.* v. *Crutchfield*, 108 Ind. 518; *Grace* v. *American Central Ins. Co.*, 109 U. S. 278; *Boetcher* v. *Hawkeye Ins. Co.*, 47 Iowa, 253; *Van Schoick* v. *Niagara Fire Ins. Co.*, 68 N. Y. 434; *Gans* v. *St. Paul, etc., Ins. Co.*, 43 Wis. 108.

This rule rests on sound principle, for the facts, and not the recitals, establish the relation of principal and agent. Courts will look through form to substance, and give effect to the rights of the parties as the material and real facts show them to be. Another reason for the rule is, that to permit a formal recital to control would, in many instances, enable an insurance company to commit a fraud by shutting out the truth by a mere recital.

The agent of the appellant had authority to make the contract upon which this action is founded. He represented the corporation and did its business at the place where his agency was located. Either he was its agent or else it had no representative; but it did have a representative, so that he was its agent; and, as he was its agent, he acted for the corporation as long as he kept within the scope of his ostensible authority. It is immaterial what private instructions the corporation may have given him, provided they were not brought to the knowledge of the assured. The rule that private instructions do not bind a party dealing with an agent unless he has notice of them applies to contracts of insurance as well as to other contracts. *Hartford Fire Ins. Co.* v. *Farrish*, 73 Ill. 166; *Equitable Life Assurance Co.* v. *Brobst*, 18

Neb. 526 ; *Lycoming Fire Ins. Co.* v. *Woodworth*, 83 Pa. St. 223 ; *Insurance Company* v. *McCain*, 96 U. S. 84; *Fletcher* v. *New York Life Ins. Co.*, 4 McCrary, 440; *Campbell* v. *National Life Ins. Co.*, 24 Up. Can. C. P. 133.

Nixon was an agent of a foreign corporation, and as such its only authorized representative within the territory over which he was given authority. Within that territory, his acts, so long as they were within the general scope of his agency, were those of his principal. *Campbell* v. *National Life Ins. Co.*, *supra.*

Upon the principles asserted by us and established by the authorities we have cited, it is clear that Nixon had general authority to make contracts of insurance, and this authority extended to parol as well as written contracts. This position is amply fortified by authority. Our own cases sustain it. *New England, etc., Ins. Co.* v. *Robinson*, 25 Ind. 536 ; *American Horse Ins. Co.* v. *Patterson*, 28 Ind. 17 ; *American Ins. Co.* v. *McWhorter*, 78 Ind. 136. The cases elsewhere are in line with our own. *Putnam* v. *Home Ins. Co., supra ; Sanborn* v. *Fireman's Ins. Co.*, 16 Gray, 448 ; *Goldwater* v. *Liverpool, etc., Ins. Co.*, 39 Hun, 176 ; *Schomer* v. *Hekla Fire Ins. Co.*, 50 Wis. 575 ; *Humphrey* v. *Hartford Fire Ins. Co.*, 15 Blatch. 504 ; *Cohen* v. *Continental Fire Ins. Co.*, 67 Tex. 325 ; *Ellis* v. *Albany, etc., Ins. Co.*, 50 N. Y. 402 ; *Post* v. *Ætna Ins. Co.*, 43 Barb. 351.

There was a valid parol contract of insurance. Nixon, as the representative of the foreign corporation, made the contract. He was, as we have seen, clothed with ostensible authority to make such contracts, and the assured was not bound to inquire into the exact extent of that authority. He had authority to make the contract, and the risk began at the time stipulated, although the policy was not delivered to the assured. *New England, etc., Ins. Co.* v. *Robinson, supra ; American Horse Ins. Co.* v. *Patterson, supra ; American Ins. Co.* v. *McWhorter, supra ; Kelly* v. *Commonwealth Ins. Co.*,

10 Bosw. 82 ; *Collins* v. *Phœnix Fire Ins. Co.*, 14 Hun, 534; *Ellis* v. *Albany, etc., Ins. Co., supra.*.

We do not regard the case of *Diver* v. *London, etc., Ins. Co.*, 17 Ins. L. J. 156, as in point, even if well decided, for there the terms of the contract were not all agreed upon, while here the terms of the agreement, so far at least as the agent had authority to contract, were fully agreed upon, and all things finally settled, except, perhaps, the formal approval and execution of the policy. But we are not to be understood as approving the decision in the case cited; we pass it, however, with the additional remark that it is difficult, if not impossible, to reconcile it with the decision in the case of *Cooke* v. *Ætna Ins. Co.*, 7 Daly, 555.

We have no doubt that the counsel for the appellant are right in affirming, that it is essential to the contract of insurance that there should be a meeting of the minds of the contracting parties upon all the elements of the contract. This is but the application of a rudimental principle to a particular instance. But we can not assent to counsel's proposition that, in this instance, there was no meeting of minds. If Nixon was the agent of the corporation, then his acts were the acts of the corporation. Of this there can be no doubt, for an agent invested with authority to act for his principal acts as the principal in exercising that authority. If Nixon agreed to the contract as the appellant's authorized agent, then, in legal contemplation, the appellant agreed to it. That Nixon was the agent of the company we have already shown, and that he did agree to the terms of the contract, and in the fullest extent, is very clear. We conclude upon this point that there was a meeting of minds and that the parol contract was complete in all its parts.

It is probably true that the appellant might rightfully have repudiated the contract made by its agent. If, however, this be granted, it will not here avail the appellant. To make such a right available, the insurer must, in such a case as this, notify the assured of the cancellation of the con-

tract. It is not enough for an insurance company to notify its own agent. Notice to its agent is notice to itself; this it is, and nothing more. Manifestly, such a notice is futile. If the company trusts its agent, it must suffer, not the assured. It selected its agent, placed confidence in him, and held him out as worthy of that confidence, and, after it discovered his misconduct, it ought to have notified the assured, who, as its officer knew, had relied on his conduct. A brief recapitulation of the facts will make it clear that equity requires this conclusion.

On the 24th day of July the parol contract was made; on that day it was entered on the company's record, a report of the contract and its terms was forwarded to the chief officers at Cincinnati, and that report showed that the risk began on the 24th day of July. On the 25th the officers at Cincinnati wrote the company's agent to cancel the risk or obtain a higher rate. They at that time, therefore, recognized his authority to make the contract, and, without denying the contract, directed a cancellation or an increase in the premium. To this letter the agent made no reply. On the 10th of August they again wrote, but they received no answer. Again they wrote, and that letter, like its predecessors, passed unanswered. A few days after the last letter was written, August 22d, 1885, the company sent a special agent to New Castle to examine the affairs of the agency at that place; he discharged Nixon, took from his possession the policy made out for the relators, and returned it to the office at Cincinnati for cancellation.

No notice was at any time given the assured of the action taken by the company or of the agent's disobedience of instructions. With knowledge of all these material facts, the officers of the company remained silent. Not a word of warning was given the assured. On the plainest principles of justice, the company was bound to give the assured notice of the repudiation of the contract. Facts were before its officers which clearly informed them what the agent had done,

and from which the natural inference was that the assured, reposing confidence in the acts of the agent, were resting in security, believing that the property in their charge was insured. Having the means of knowledge is equivalent to knowledge, and, therefore, the company did have knowledge. With this knowledge, its conduct can neither be justified nor excused. The wrong admits of no defence, and of it the company can not take advantage. Where an insurance company has knowledge that its agent has made a contract of insurance, and has facts before it apprising it that the assured rests on the contract, it can not cancel that contract without notice to the assured. This conclusion stands on solid principle, and is sustained by authority. *Mohr, etc., Co.* v. *Ohio Ins. Co.,* 13 Fed. Rep. 74; *Runkle* v. *Citizens' Ins. Co.,* 6 Fed. Rep. 143. Any other rule would place it in the power of an insurance company to wrong an assured whose only error was that he trusted the chosen agent of the company. Any other rule would place it in the power of an insurance company to take the chances of a loss, and, if none occurs, retain the premium; but, if one does occur, repudiate the contract and compel the assured to bear the loss. No rule which would permit these consequences can have our sanction. Nor does the rule we assert require much of the company; it simply requires it to do what in common fairness and good conscience it ought to do, notify the assured. An insurer that is unwilling to do this much deserves no favor in a court of justice. This much is required in commercial transactions, for through all the law of agency runs the doctrine that a principal, who is fully informed of his agent's act, must promptly disavow it or else answer for it. This disavowal, any one can see, is of no effect unless communicated to the party who trusted the agent.

Upon many of the questions presented by the record the decision in *Ellis* v. *Albany, etc., Ins. Co.,* 50 N. Y. 402, bears strongly, and, upon some of them, decisively, but we here quote from it to a single point. Among other things the court there

said: "It may be said that this construction would enable McCoy to perpetrate a fraud upon the company by making preliminary contracts when its design was only to become bound by writing. This, to a certain extent, may be true; but it furnishes no reason for depriving third persons of the benefit of contracts entered into with him as its agent, who relied thereon for indemnity from a loss from the peril embraced in the contract, by a construction of the papers more strict and rigid than is fairly required by their import. It is an elementary rule that the principal must bear a loss sustained by the misconduct of his agent, acting within the scope of his authority, rather than a third person who has fairly dealt with him as such." The elementary principle to which the court refers applies here with peculiar force.

We do no more, after all, than apply a settled principle to a particular instance. We adjudge that the appellant was under a duty to speak, and that silence was a wrong. One under no duty to speak may be silent and be safe; but one under a duty to speak is silent at his peril. This principle is almost as old as the law itself, and has ever occupied a conspicuous position in jurisprudence. It is equitable in itself and just in its operation. The appellant has chosen to be silent when justice required speech, and it must abide the consequences.

Judgment affirmed.

Filed Feb. 17, 1888.