POLLOCK *v.* GERMAN FIRE-INSURANCE CO.[1]

1. Fire Insurance — Foreign Companies — Agency — Exchange Insurance — Removal of Insured Property — Consent of Agent.

Where an insurance agent, on being applied to for insurance, procured another agent to write a policy in one of his foreign companies, and thereafter delivered the policy to the insured and collected the premium, the insured supposing him to be the agent of the insurer, he did in law become such agent, under 2 Comp. Laws, § 7246 (providing that any person who aids in transacting the business of a foreign insurance company shall be deemed to be its agent), so that his consent to the removal of the insured property to other premises was binding on the insurer.

2. Fire Insurance — Removal of Insured Property — Consent of Agent — Waiver of Provisions of Policy.

Where application is made to the agent of an insurance company for permission to remove insured property to another location, and the agent verbally consents to the removal, but fails to indorse such consent on the policy, such failure cannot be set up by the company as a defense to an action on the policy, notwithstanding a provision therein that no officer, agent, or representative of the company shall have power to waive any provision or condition of the policy, or to grant any privilege or permission affecting the insurance, except by writing so indorsed.

3. Insurance — Notice — Subagency.

Notice to a clerk in the office of an insurance agent, as to matters affecting a risk, is notice to the agent.

4. Fire Insurance — Removal of Insured Property — Consent of Insurer — Estoppel.

When an insurance company is advised of the removal of insured property to another location, it becomes its duty either to consent to the removal, or to cancel the policy and return the unearned premium, as provided in the policy; and, in case of its failure to act upon the latter alternative, it will be held to have accepted the former.

---

[1] Rehearing denied November 4, 1901.

Error to Wayne; Hosmer, J. Submitted March 7, 1901. Decided July 10, 1901.

*Assumpsit* by Henry B. Pollock, Charles A. Pettibone, and William H. Chapman, copartners as Pollock, Pettibone & Chapman, against the German Fire-Insurance Company of Pittsburg, Pennsylvania, on a policy of insurance. From a judgment for defendant on verdict directed by the court, plaintiffs bring error. Reversed.

*Fred H. Warren,* for appellants.

*Tarsney & Fitzpatrick,* for appellee:

Cited, to the point that there can be no such thing as a verbal waiver of the provisions of the standard policy: *Kyte* v. *Assurance Co.,* 144 Mass. 43 (10 N. E. 518); *Putnam Tool Co.* v. *Insurance Co.,* 145 Mass. 265 (13 N. E. 902); *Parker* v. *Insurance Co.,* 162 Mass. 479 (39 N. E. 179); *Moore* v. *Insurance Co.,* 141 N. Y. 219 (36 N. E. 191); *Gray* v. *Insurance Co.,* 155 N. Y. 180 (49 N. E. 675); *Hankins* v. *Insurance Co.,* 70 Wis. 1 (35 N. W. 34); *Bourgeois* v. *Insurance Co.,* 86 Wis. 606 (57 N. W. 347); *Straker* v. *Insurance Co.,* 101 Wis. 413 (77 N. W. 752); *Smith* v. *Insurance Co.,* 60 Vt. 682 (15 Atl. 353, 6 Am. St. Rep. 144, 1 L. R. A. 216); *Insurance Co.* v. *Hook,* 62 Ohio St. 256 (56 N. E. 906); *Insurance Co.* v. *Myers,* 62 Ohio St. 529 (57 N. E. 458, 49 L. R. A. 760); *Robinson* v. *Fire Association,* 63 Mich. 90 (29 N. W. 521); *Cleaver* v. *Insurance Co.,* 65 Mich. 527 (32 N. W. 660, 8 Am. St. Rep. 908), 71 Mich. 414 (39 N. W. 571, 15 Am. St. Rep. 275); *Cook* v. *Insurance Co.,* 84 Mich. 12 (47 N. W. 568); *Gould* v. *Insurance Co.,* 90 Mich. 302 (51 N. W. 455); *Mallory* v. *Insurance Co.,* 97 Mich. 416 (56 N. W. 773); *Ranspach* v. *Insurance Co.,* 109 Mich. 699 (67 N. W. 967); *Sutherland* v. *Insurance Co.,* 110 Mich. 668 (68 N. W. 985); *Wadhams* v. *Assurance Co.,* 117 Mich. 514 (76 N. W. 6).

MOORE, J.    This is an action upon a fire-insurance policy. The circuit judge directed a verdict for the defendant. The case is brought here by writ of error.

The policy was dated September 4, 1898, and was for one year. It contained the following provisions:

"This policy is made and accepted subject to the foregoing stipulations and conditions, together with such other provisions, agreements, or conditions as may be indorsed hereon or added hereto; and no officer, agent, or other representative of this company shall have power to waive any provision or condition of this policy, except such as, by the terms of this policy, may be the subject of agreement indorsed hereon or added hereto, and as to such provisions and conditions no officer, agent, or representative shall have such power, or be deemed or held to have waived such provisions or conditions, unless such waiver, if any, shall be written upon or attached hereto; nor shall any privilege or permission affecting the insurance under this policy exist, or be claimed by the insured, unless so written or attached."

"This policy shall be canceled at any time at the request of the insured, or by the company by giving five days' notice of such cancellation. If this policy shall be canceled as hereinbefore provided, or become void or cease, the premium having been actually paid, the unearned portion shall be returned on surrender of this policy or last renewal, this company retaining the customary short rate, except that, when this policy is canceled by this company by giving notice, it shall retain only the *pro rata* premium."

It is conceded that, if defendant is liable at all, it is for $1,800, and interest from July 19, 1899.

The facts are not in dispute. The plaintiffs are wholesale merchants in Detroit. For some years their place of business was at 143 Jefferson avenue. They carried a considerable line of insurance, about one-half of which was placed with Vernor Bros., and the other half with Bierce & Sage. The plaintiffs did not know that either of these firms issued to them policies in any company for which they were not themselves agents. When the plaintiffs desired insurance, they would notify one or the other of these firms of the amount. The policy or policies would be written, and delivered to them, and the premium would be paid to the firm procuring the policy. In September, 1898, plaintiffs ordered from Bierce & Sage $4,000 of insurance, and they delivered two policies of $2,000 each, running one year from above date. One of these policies was

in the defendant company. Bierce & Sage were not agents for this company, but it was represented in Detroit by one Victor P. Gaukler, from whom Bierce & Sage ordered the insurance. Gaukler delivered the policy to Bierce & Sage, and the latter delivered it to plaintiffs. Later Bierce & Sage collected the premium from plaintiffs, and made a settlement with Gaukler.

When these policies were delivered to plaintiffs, there appeared pasted on the outside of each policy as folded, near the bottom, a printed green slip 3½ inches long by 1⅛ inches wide, upon which was the following:

"BIERCE & SAGE,

"GENERAL INSURANCE AGENTS,

"5 Whitney Opera House Bldg.

"Telephone: Both Lines, 1,112.

"DETROIT, - - - - MICH."

The plaintiffs supposed Bierce & Sage were the agents for these companies, and not until after the fire did plaintiffs know that Bierce & Sage had furnished them any insurance in companies for which they were not the actual agents. Plaintiffs did not know Gaukler at all; had never had any insurance business with him. All the business regarding these policies was done solely with Bierce & Sage, and they knew no one else in the transaction. It further appeared by the testimony of Sage, Vernor, and Waterfall, who have been in the fire-insurance business in Detroit from 6 to 25 years, that it is customary to write what is known as "exchange insurance;" that when an agent receives an order for insurance, which, for some reason, he cannot write in his own companies, he places it with other agents. In such cases the customer does business solely with the agent with whom he places the order, and does not know or come in contact with the agent who actually writes the policy at all. The first agent delivers the policy, collects the premium, attends to renewals, and settles with the agent or company who wrote the insurance. It also appeared by the testimony of the same wit-

nesses that it was the universal and invariable custom among insurance agents, whenever they ordered insurance from another agency, to place their own names on the policy as agents, either by paster or rubber stamp, before delivering it to the customer; also that, if some privilege was asked or granted during the life of the policy, it would be the duty of the agent who took the original order for the insurance, and delivered the policy, to see that the permit slip was attached to the policy or delivered to the customer. It was further shown that agents who have authority to write policies have authority to consent to transfers from one location to another; that it would be their duty, upon receiving such a request, to see that the transfer was made, or a reason given for not transferring it; that an agent might consent to a transfer, and the company afterwards refuse it; but that, in all cases where a transfer was refused, it would be the duty of the company to give the customer five days' notice of the cancellation of his policy, and return to him the unearned premium *pro rata*.

Plaintiffs began moving from 143 to 185 Jefferson avenue about January 1, 1899. Before commencing to move, Robert Pollock had called the attention of Frank Sage, an employé and special agent for Bierce & Sage, to the contemplated change, and shown him the new location. Sage told him he was glad they were going to move, that it was a better risk, and that their insurance must be transferred. The record shows the fire risk in the new location was regarded as less than the old one. January 3d, Robert Pollock telephoned Bierce & Sage to transfer their insurance from 143 to 185, and, on the 5th, Vernor Bros. were ordered by telephone to transfer theirs. The message to Bierce & Sage was received by Mr. Sage himself, and he at once looked up the insurance covering the risk. They had a record in their office of all the insurance they had placed for the plaintiffs, including the policy written by Gaukler in the defendant company, and a policy written by Waterfall in the Citizens', of Pittsburg. Mr. Sage then

called up Gaukler's office, and told the young lady who answered the telephone that Pollock, Pettibone & Chapman were moving, or had removed, to 185 Jefferson avenue, and wanted their insurance transferred. He also called up Waterfall, and told him the same thing. He then instructed two young ladies in the office—Miss Jakel and Miss Lennox—to make out transfer slips in all the companies represented by them, which was done. All of these policies were transferred as of January 3d, except two, which were transferred on the 9th. Vernor Bros.' insurance was transferred January 5th. When the order for the transfer came in, Mr. Harmon Vernor made out transfer slips, and carried them over to plaintiffs. Robert Pollock took the policies from the safe, and handed them to Vernor, who pasted the transfer slips on the policies, and gave the bunch back to Pollock, who returned them to the safe. Plaintiffs supposed all their insurance had been transferred to the new location.

The fire occurred April 4, 1899. The two agencies were notified. Bierce & Sage notified all their companies. The loss was adjusted by a committee of adjusters representing the insurance companies, and by Mr. Chapman and Mr. Pettibone for the plaintiffs. The loss on stock was adjusted at $27,000, and all the companies have paid except the defendant and the Mercantile Fire & Marine. After the fire, it was discovered that these two policies had not been formally transferred to the new location by transfer slips actually affixed to the policies, although plaintiffs supposed all insurance had been transferred, and Bierce & Sage did not know until after the fire that the transfer had not been made. It does not appear why the transfer was not made upon the policy in suit. Mr. Gaukler had died before the trial. The policy was never canceled, nor was a return or tender of any portion of the premium money made. When the defendant was notified of the fire, it denied any liability, for the reason "that this policy was not transferred to No. 185 Jefferson avenue, nor did our agent consent to its transfer." It is insisted Bierce &

Sage were not defendant's agents, and that no permission was given in writing to remove the goods to the new location.

The first question calling for attention is, Under the facts and circumstances shown, were Bierce & Sage agents of the defendant? The legislature of this State has undertaken to regulate the manner in which, and the conditions under which, foreign insurance companies can do business in this State. Section 7246, 2 Comp. Laws, makes it obligatory upon the company to do certain things before it can do business at all in the State. The section also contains a provision reading as follows:

"The term 'agent' or 'agents,' used in this section, shall include any acknowledged agent, surveyor, broker, or any other person or persons who shall in any manner aid in transacting the insurance business of any insurance company not incorporated by the laws of this State."

Wisconsin has a statute in substance like this one, which has been construed by the courts of that State a number of times. In *Schomer* v. *Insurance Co.*, 50 Wis. 575 (7 N. W. 544), the facts were almost, if not quite, the same as those in this case, Lawson standing in the place of Bierce & Sage. In disposing of the case the court said:

"Now, it is difficult to imagine what object this provision was intended to accomplish, or what purpose subserve, if it has not the effect, under the circumstances, to make Lawson the agent of the defendant in the transaction. His acts certainly bring him within both the letter and spirit of the law. He was the only real actor for the defendant in making the contract. *Pro hac vice* he assumed to represent, and did represent, the company in the matter. He received the application, settled with the insured the rate and terms of insurance, delivered to them the policy, collected the premiums, and shared in the commission. In fact, he did everything that was done on behalf of the company, except the mere act of countersigning the policy. He was the only person the plaintiffs dealt with. They knew no other agent in effecting the insurance. They were totally ignorant of his relation to

the defendant, or of his want of authority to represent and act for it. It is idle to contend that he did not in any manner aid or assist in making the contract for the company, when he was, in fact, the only person who did treat with the plaintiffs on its behalf. * * *

"But it is said that it was unreasonable to make the defendant responsible for the acts of Lawson, who was never authorized to act for it or bind it in any way. The answer to this objection is, the legislature has assumed the right to regulate the business of insurance, and prescribe the manner in which it shall be conducted in this State. It has declared that whoever solicits insurance on behalf of an insurance company, or makes any contract of insurance, or in any manner aids or assists in making such contract, or transacts any business for the company, shall be held an agent of such company to all intents and purposes. The obvious intention of the legislature is to make an insurance company responsible for the acts of the person who assumes really to represent and act for it in these particulars, and to change the rule of law that the insured must, at his peril, know whether the person with whom he is dealing has the power he assumes to exercise, or is acting within the scope of his authority. * * * It seems to be designed in the clearest manner to make the company responsible to the public for the acts of one whom it permits to solicit insurance on its behalf, or who receives applications for insurance, makes or aids in making contracts of insurance, or transacts the business, whether such person has in fact authority to act for it or not. The law imposes upon the company the duty of seeing to it that none but its regular authorized agents shall do its business or deal with the public. It is certainly not difficult for an insurance company to say to its local agents that they alone must transact its business; that they must in all cases deal directly with the insured in making insurance contracts, and not allow the interference of any stranger in its business, for whose acts it does not wish to be held responsible. That this is the plain object and intent of the statute we have no doubt. And, where the insurance company issues a policy in a case where a person has assumed the right to act for and represent it in making the contract, it must abide by the consequences, and meet the liability which the statute imposes upon it."

A like statute applying to a like case was construed in *Continental Ins. Co.* v. *Ruckman*, 127 Ill. 364 (20 N. E. 77, 11 Am. St. Rep. 121), where the court said:

"The manifest intention was to make such companies responsible for the acts not only of its acknowledged agents, etc., but also of all other persons who in any manner aid in the transaction of their insurance business. Nor do we see anything inequitable or oppressive in such provision. Doubtless, the mere assumption of authority to act for an insurance company will not of itself charge the company with responsibility for the acts of the assumed agent. The company must in some way avail itself of such acts, so that the person performing them may be said to aid the company in its insurance business. But, after a company has availed itself of the acts of an assumed agent, and thus adopted them as its own, there is nothing oppressive in assuming, as against such company, the existence of the relation of principal and agent, and charging the company with responsibility for such acts."

See, also, *Alkan* v. *Insurance Co.*, 53 Wis. 136 (10 N. W. 91); *Body* v. *Insurance Co.*, 63 Wis. 157 (23 N. W. 132); *Bennett* v. *Insurance Co.*, 70 Iowa, 600 (31 N. W. 948); *May* v. *Assurance Co.*, 27 Fed. 260; *McGraw* v. *Insurance Co.*, 54 Mich. 145 (19 N. W. 927); *Ahlberg* v. *Insurance Co.*, 94 Mich. 259 (53 N. W. 1102). We see no reason why the same construction should not be put upon this statute that has been put upon like statutes in sister States.

We then come to the question, Does the liability of the company cease because the goods were removed to a new location without the consent to the removal being indorsed upon the policy? In *Maryland Fire Ins. Co.* v. *Gusdorf*, 43 Md. 506, the policy provided that "anything less than a distinct agreement indorsed on this policy shall not be construed as a waiver of any written or printed condition, restriction, or stipulation herein contained." The goods were damaged by fire during the life of the policy, but not until they had been removed to an adjoining building. Previous to the removal, the insured went to the company's office, and there saw the president, and notified him that he desired to move into another brick building, and asked whether there was any objection to his so doing. The president asked him if he had his policy with him, and, on

being informed he had not, replied it did not matter; he could fix it all right.    Insured understood him to say it was not necessary for him to bring the policy.    The company defended on the ground that there was no indorsement on the policy consenting to the removal of the goods. Miller, J., after referring to the case of *National Fire Ins. Co.* v. *Crane*, 16 Md. 260 ( 77 Am. Dec. 289 ), which was a case of additional insurance without the stipulated indorsement on the policy, said:

"Since that decision the doctrine of equitable estoppel has, especially in insurance cases, been extended, and applied at law as well as in equity, by adjudications of the courts of last resort in many of the States, and the current and weight of judicial precedent and authority in this country have established the proposition that in such cases the estoppel is equally available in either tribunal.    The Supreme Court in *Wilkinson's Case*, 13 Wall. 222, has also in a very able opinion sustained this position.    * * * ' The principle is that, where one party has, by his representations or his conduct, induced the other party to a transaction to give him an advantage, which it would be against equity and good conscience for him to assert, he would not, in a court of justice, be permitted to avail himself of that advantage.'    This proposition, thus sustained by the modern decisions, and founded in reason and justice, they add, does not admit that the written instrument may be contradicted by oral testimony, but goes upon the idea that it may be shown by such testimony that the written instrument cannot be lawfully used against the party whose name is signed to it.

"Most of the reported cases in which this doctrine has been applied are those where the acts, representations, or omissions of the agents of the companies precede or attend the issuing of the policies.    But it is also applicable where facts arise during the currency of the contracts; as, for instance, where, in case of insurance by a mutual insurance company, assessments have been made and received by the company on the premium note, or where premiums have been received, after knowledge, actual or constructive, of the invalidity of the policy *ab initio*, or of a subsequent breach of its conditions.    2 May, Ins. § 502.    In our opinion, the case before us falls clearly within the principle thus established, and it is no extension of the doctrine

thus to apply it. The assured, before removing his goods, applied in person to the president of the company, and asked him if there was any objection,—that is, would the removal affect the continuance of the insurance upon them? He was informed by the president, who knew of the absence of the policy at the time that it was no matter, that he would fix it all right, and that he need not bring the policy. That is, he said to the assured, in effect: ' Go on, and remove your goods. You need not bring your policy, and have the permission to do so indorsed on it. The insurance shall continue in force without such indorsement.' The assured departs, and removes his goods, relying upon the statements and assurance thus made and given to him. By so acting he did that which prejudiced his interest under the policy. He thereby gave the company the advantage of retaining the premium without further continuance of the risk, and also the advantage of setting up this defense against their liability after the loss had occurred. Would not the success of this defense operate a fraud upon the assured ? We think it clear the company ought to be and are estopped from making it. Whilst the law affords ample protection to these companies, as well as to individuals, against frauds, misrepresentations, and breaches of warranty, it will not, and ought not, to help them to perpetrate frauds upon those with whom they make contracts, in which good faith on both sides, as well in their continuance as origin, has always been regarded as a ruling consideration."

In *Henschel* v. *Insurance Co.*, 4 Wash. 476 (30 Pac. 735, 31 Pac. 332, 765), the insured, desiring to remove his goods several blocks distant from the place where they were originally insured, delivered his policy to the company's agent, who promised to indorse consent to the removal on the policy, in writing, and return it to him. Before the indorsement was made, the building to which the goods had been in the meantime removed was burned, and a loss occurred. The agent then indorsed a cancellation on the policy. The company disclaimed liability, and in an action insured recovered the full amount of the insurance. The policy contained a clause like the one in the policy in this case as to limitations upon the power of agents and the necessity for written indorsements. Stiles, J., said:

"The appellant substantially claims for this clause the construction that, until its consent was physically indorsed upon the paper, the property of the respondent was unprotected in its new location, notwithstanding the agreement of the agent to indorse the necessary consent, and his receipt and retention of the policy for that purpose. The respondent claims that the conduct of the agent estops the appellant to say that the proper indorsement was not made.

"Appellant's counsel have presented us many eminent authorities upon the subject of the waiver of conditions in such contracts by agents, but, with due respect to the learning of counsel and the force of the authorities they produce, we cannot regard this as a case of technical waiver. We do not find that the respondent is proposing to strike from the policy a single line or word, but that, fully recognizing the binding force of the extremest stipulations against him, he went to the agent, and himself proposed a strict compliance with them. To this proposition the agent assented, and agreed, not that anything should be waived, but that he himself would indorse upon the contract the words necessary to cover the goods in their new location; and now the respondent, invoking the equitable rule that, since he has relied upon the promise made to him, what was agreed to be done shall be taken as having been done, claims that the contract is what it, but for the negligence of the agent, undoubtedly would have been."

The court then proceeds to discuss the power of the agent, and quotes with approval *Maryland Fire Ins. Co.* v. *Gusdorf*, 43 Md. 506, and closes with these words:

"So, in this case the appellant, having received the premium for a year's insurance, now, without any offer to return any portion of the unearned premium, sets up what we deem an unconscionable defense, when it claims that, after actually insuring the respondent less than 30 days, the neglect of its own agent to do what he ought to have done should relieve it of all liability."

In *Pelkington* v. *Insurance Co.*, 55 Mo. 172, where it was made the express condition of a contract of insurance that, if the insured should make any other insurance on the property without the written consent of the company indorsed on the policy, he should recover no insur-

ance thereon, and it appearing that the agent was duly notified of such additional insurance, and made no objection, the court said:

"When the assured has notified a company that he has procured additional insurance, it is the duty of the company, if it does not intend to be further bound or to continue the risk, to express its dissent, and not allow the party to repose in fancied security, to be victimized in case of loss. It is unconscientious to retain the premium, and affirm the validity of the contract, whilst no risk is imminent, but, the very moment that a loss occurs, to then repudiate all liability and claim a forfeiture. If the indorsement is not made upon notice duly given, a waiver will be presumed, in the absence of any dissent. If a party, by his silence, directly leads another to act to his injury, he will not be permitted, after the injury has happened, to then allege anything to the contrary; for he who will not speak when he should, will not be allowed to speak when he would."

See *Copeland* v. *Insurance Co.*, 77 Mich. 560 (43 N. W. 991, 18 Am. St. Rep. 414); *Tubbs* v. *Insurance Co.*, 84 Mich. 652 (48 N. W. 296).

In this case Bierce & Sage notified the persons in charge of Mr. Gaukler's office of the removal of these goods. This would be notice to the agent, and hence notice to the company. In *Steele* v. *Insurance Co.*, 93 Mich. 84, 85 (53 N. W. 514), GRANT, J., said:

"The precise claim is that the local agents cannot redelegate their authority to clerks, unless such authority to redelegate is conveyed in express terms. In general, this is true; but courts will recognize the ordinary course of business. It must be well known that these local agents do their business to a very large extent through clerks, who solicit insurance, make out applications and policies, and generally attend to the business of their employers. In such cases their acts are as binding as though done by the agents themselves,"—citing Story, Ag. § 14; *Continental Ins. Co.* v. *Ruckman*, 127 Ill. 364 (20 N. E. 77, 11 Am. St. Rep. 121); *Bodine* v. *Insurance Co.*, 51 N. Y. 117 (10 Am. Rep. 566); *Bennett* v. *Insurance Co.*, 70 Iowa, 600 (31 N. W. 948).

See, also, *Eclectic Life Ins. Co.* v. *Fahrenkrug*, 68 Ill. 463.

There could be no possible question about the authority of Gaukler to consent to the removal of these goods, and, he and the company having knowledge of their removal, it became the duty of the company to do one of two things, —either consent to the removal, or cancel the policy and return the unearned premium. It could not retain the premium, and thus profit by it in case there was no loss, and, the moment there was a loss, deny any liability, though still retaining the premium. *McGraw* v. *Insurance Co.*, 54 Mich. 148 (19 N. W. 927); *Haire* v. *Insurance Co.*, 93 Mich. 481 (53 N. W. 623, 32 Am. St. Rep. 516); *Ætna Ins. Co.* v. *Maguire*, 51 Ill. 342; *Goit* v. *Insurance Co.*, 25 Barb. 189; *Hathorn* v. *Insurance Co.*, 55 Barb. 28.

We think, under the facts shown by this record, defendant company is liable. The judgment is reversed, and a new trial granted.

MONTGOMERY, C. J., HOOKER and GRANT, JJ., concurred. LONG, J., did not sit.