O'NEILL  v.  NORTHERN  ASSURANCE  CO.  OF  LONDON, ENGLAND.

1. APPEAL AND ERROR—REVIEW—DIRECTED VERDICT—PROPRIETY.
   On review of a judgment on a directed verdict, the court considers the testimony in the light most favorable to the plaintiff in error.

2. FIRE INSURANCE—BROKERS—AGENCY FOR INSURER—CANCELLATION OF POLICY.
   Two of several fire-insurance companies, represented by a single agent, canceled their policies on plaintiffs' building, whereupon the agent as broker procured insurance through another agency without notifying plaintiffs of the substitution of companies.   Defendant, one of the later insurers, subsequently canceled its policy, but notified only the broker.   Held, that the broker was the agent of the insurer, and not of the insured, and had no authority to consent to the cancellation of the policy.

3. SAME—LAND CONTRACT—PURCHASER'S DUTY TO INSURE.
   Where a land contract obligated the purchaser to keep the building upon the land insured for the benefit of his vendors, and he, with the knowledge of his vendors, appointed an agent to represent him in that respect, who procured insurance and was notified of its cancellation, the question whether he had authority to and did consent to the cancellation should be left to the jury.

Error to St. Clair; Tappan, J. Submitted May 2, 1906. (Docket No. 80.) Decided September 20, 1906.

Assumpsit by John G. O'Neill and others against the Northern Assurance Company of London, England, on a policy of insurance. There was judgment for plaintiffs on a verdict directed by the court, and defendant brings error. Reversed.

*Frank T. Wolcott* (*Myron H. Beach*, of counsel), for appellant.

*Cady & Crandall* (*Phillips & Jenks*, of counsel), for appellees.

Blair, J. Plaintiffs brought this action to recover for a loss by fire of property insured by defendant in a Michigan standard form policy, issued March 1, 1904, to plaintiffs, John G. O'Neill, George W. Moore, Fred J. Dixon, and W. L. Jenks. Attached to and forming a part of the policy was a rider containing the following:

"Arthur L. McCormick having agreed to purchase the above described property under contract, loss, if any, payable to the Commercial Bank, as its mortgage interest may appear, second to John G. O'Neill, Fred J. Dixon, W. L. Jenks, and George W. Moore, as their contract interest may appear, balance, if any, to Arthur L. McCormick."

The land contract contained a provision that McCormick should "keep the buildings erected upon said property insured in companies to the satisfaction of first parties to the amount of at least $10,000, for the benefit of the said first parties."

The defense was that the policy had been lawfully canceled before the fire, which occurred on July 22, 1904. The circuit judge held that no valid notice of cancellation prior to the loss had been shown, and directed a verdict for plaintiffs. Defendant contends that the question should have been submitted to the jury. This contention

involves a consideration of the testimony in the light most favorable to the defendant. It appears that Arthur L. McCormick, the vendee in the land contract, was absent from Port Huron most of the time, and had authorized his brother, Byron J., to take charge of the theater building and the insurance thereof, paying whatever premiums were paid. Some time before March 1, 1904, an application was made by Byron J. McCormick for insurance upon the theater and its contents, to Carlton & Co., of Port Huron, who wrote two policies in companies represented by them. The companies canceled them, and, thereupon, Carlton & Co., as brokers, applied for the insurance to W. F. Davidson, of Port Huron, who was the local agent of defendant. Davidson executed the policy sued upon in this action, and another in the Queen Insurance Company, for $1,000, and delivered them to Carlton & Co., who, in turn, delivered them to plaintiff Dixon on or about March 1, 1904. Mr. Dixon handed this policy to Mr. Murphy, another insurance agent, for the purpose of having it made uniform with certain other policies, with the understanding that it was to be returned to him. Mr. Murphy retained the policy till it was obtained by Miss Ferrier from his stenographer. Mr. Davidson testified that Mr. McNutt did the insurance work for him; that his policy register showed the following entries concerning the policy in suit:

" Name and residence of assured, John G. O'Neill and others; commencement of risk, 1st day, third month, year, 1904; term, 12 months; expiration of risk, 1st day, third month, 1905; amount of insurance, $1,000; rate $2.50; amount of premium, $25. The register also shows this policy was canceled on the 31st of May, 1904, and we received return premium of $6.25. The register shows that I received that earned premium from Carlton & Company, who are insurance agents in town."

Mr. McNutt testified:

" I looked after Mr. Davidson's insurance business on March 1, 1904. The handwriting on the policy is not mine, but is Miss Wellman's. She was employed in Mr.

Davidson's office at that time. That policy was issued under my directions upon the order received from Carlton & Co., and the policy was delivered to Carlton & Co.; my impression is that it was delivered by Miss Wellman in person. I kept the register at that time. I paid the premium to the Northern Assurance Company, and extended credit to Carlton & Co. for the insurance. Carlton & Co. paid me. I made the entry of cancellation on the register, and it is in my writing. I made the entry that the Northern Assurance Company's policy was canceled, because it is my custom in keeping my records to enter the date the policies are actually taken up and canceled. All that I had to do with the taking up of the policy and canceling it was to notify Carlton & Co. that we wanted it taken up, and this is the date that we actually received it in our office. * * * I did not, at any time from the 1st of March up until the 22d of July, the date of the fire, deliver any notice of any kind upon John G. O'Neill, William L. Jenks, George W. Moore, Fred Dixon, or the McCormicks that we wanted their policies canceled, or that we could cancel them. * * * I asked personally that the policies be surrendered through the parties that we brokeraged the business, Carlton & Co. I gave verbal notice through the people whom we brokeraged the business, I think it was through the telephone. If I remember correctly, I think it was to Grace Ferrier to whom I talked, and on or about the 31st of May. It would not be over a matter of two or three days from the day I got the policy, and I think it was the same day. When I received the policy, I marked it canceled May 31st on our register, and in a day or two sent it away through the mail. I gave no further notice of any kind, either written or verbal, to any persons whatsoever."

Miss Ferrier testified that she was cashier of Carlton & Co.:

"I think the application was made by Byron J. McCormick. We wrote two policies, and our companies ordered them canceled after they were written, so we gave them to W. F. Davidson & Co. to write. We obtained two policies from Davidson & Co. in the Northern Assurance Company and the Queen Insurance Company; one of these policies is Exhibit 1. Upon obtaining the policies, I delivered them to Mr. McCormick or to Mr. Dixon; I think

it was to Mr. McCormick. The premium was not paid, although the payment of it was requested several times from Mr. McCormick. His reason for not paying it was that he did not have the money. Those two policies were canceled the latter part of May for the nonpayment of the premium. I received a telephone message from Mr. McNutt, formerly in Mr. Davidson's office, that the policies had been canceled and we had not the policies in our possession. I called upon Mr. McCormick by telephone and asked him if he had the policies. I know Mr. Byron J. McCormick, and know his voice. He answered over the telephone. I told him over the telephone that the Northern and Queen requested cancellation of the policies, and he said he had not the policies in his possession; that Mr. Murphy had them. He said I could get them from Mr. Murphy. I telephoned to Mr. Murphy and told him I wanted the policies and asked him if he had them. He said he had, and I asked him when I could get them. He said right away, so I went over to the office and Mr. Murphy was not there, but he had left the two policies out on the stenographer's desk and I got the two policies left for me from the stenographer in his office.    *    *    *

" I took the policies from there and with them I went to Mr. Davidson's office, and they canceled the policies; then I went to Mr. McCormick's office before I went to my own office. I had the two policies in my hands. I said to him : 'Here are the two policies which the company ordered canceled,' and he wanted to know what for, and I said that 'one reason is for the nonpayment of premium and that is the way all of your insurance will go unless you pay up your premium. You are out $2,000 insurance now.' He did not say anything. After showing them to Mr. McCormick, I took them over to our office and from there I took them to Davidson's office, where he canceled the policies and mailed them to the companies, I suppose. I delivered them to Mr. McNutt, who is in charge of his insurance business."

On March 5, 1904, Carlton wrote to and plaintiff Dixon received a letter containing the following :

" On March 1st, we wrote two policies—Queen No. 1,467,506 for $1,000.00—Prem. $25.00; Northern No. 765,485 for $1,000.00—Prem. $25.00. We have had to remit to our companies for these policies, and we certainly must be reimbursed. Unless these policies are paid

for by Tuesday, March 8, 1904, we will be compelled to cancel same for nonpayment of premium."

Mr. Dixon testified:

"I have had some talk with Mr. McCormick about this matter, but I do not know as he said anything about placing the policies in Mr. Murphy's hands. Mr. McCormick was interested as I am in the insurance. He had more authority than I had in regard to the insurance. He placed it all originally, and was in charge of it at this time. * * *

"All the insurance on this property was placed by McCormick, but I had to look after it. I did not pay any of the premiums for any of the insurance on this property, nor, so far as I am aware, did any of the rest of the plaintiffs in this suit, outside of the McCormicks. I had a list of the insurance in force at the time of the fire, made by myself, as I had possession of all the policies at one time. I did not have them all at the time of the fire. I had part of them. I do not know where the rest were. I presume Mr. Murphy had them. I could not say whether the McCormicks had any of them or not. Mr. Murphy was acting for me with the policies that I delivered, but I do not know what his relations were with Mr. McCormick. I was not the whole thing, but just one of four, and when I say he was acting for me, he was acting for all of them who were interested."

On June 1, 1904, Carlton & Co. mailed to Byron J. McCormick the following letter:

"*Dear Sir:* We have a policy on the Edison Theater written in July, which has not been paid for. We also have two policies written by W. F. Davidson for us on the theater, for which we are responsible for the payment of the premium. Unless these policies are paid for by Saturday [which was June 4th], we shall notify Mr. Davidson that he is authorized to cancel the policies, and we shall also cancel all the policies which this agency has written on the theater."

The position of counsel for defendant is stated in their reply brief, as follows:

"It is not claimed by defendant, appellant, that any notice of cancellation was given directly to the plaintiffs themselves, nor is it claimed that the letter of March 5,

1904, to Dixon, one of the plaintiffs, operated as a cancellation.. This was not the position assumed in appellant's original brief and is not contended for now. It is contended, however, that the evidence in this case establishes the fact that Carlton & Co., the brokers who obtained the insurance, were thereafter constituted the agents of the plaintiffs, appellees, to cancel and surrender the policy, which they did; and, further, that even if this court should hold that there was not sufficient evidence appearing in this record to submit to the jury upon that question, yet, it is conclusively shown by the evidence that Byron J. McCormick was the agent of the plaintiffs and had authority to receive notice of cancellation and to agree to the cancellation and surrender of the policy."

There is no evidence in this record which would warrant the inference that Carlton & Co. were "constituted the agents of the plaintiffs to cancel and surrender the policy." So far as the testimony discloses, McCormick dealt with Carlton & Co. solely in the procuring of the insurance. The insurance was originally written in companies which Carlton & Co. represented. When those companies canceled the policies, Carlton & Co., without the knowledge of McCormick or the plaintiffs, so far as the record shows, procured the policies through Davidson. McCormick had no dealings with Davidson till after the contract had been made, when he received the following letter:

"PORT HURON, MICH., March 3, 1904.
"Mr. BYRON J. McCORMICK,
          " Manager of Edison Theater Co.,
                    " Port Huron, Mich.
"*Dear Sir:* I have been called upon to brokerage $2,000 insurance on your theater, and the same is bound. Yesterday noon one of the State representatives was in the office and I called his attention to the fact that we had bound his company, and he immediately went to look over the risk. [Then follows a specification of the objections, and a request that the objectionable features be remedied.] Trusting you will comply with this letter and will report to me so that I may say to the company these minor repairs have been attended to.
                    " W. F. DAVIDSON,
                              "F. G. M."

The premium was to be paid to Carlton & Co., who made frequent demands for its payment. Under such circumstances, they were agents of the defendant. *Pollock* v. *Insurance Co.*, 127 Mich. 460, 132 Mich. 225; *Bliss* v. *Insurance Co.*, 134 Mich. 212. Even if it should be held that Carlton & Co. procured the policy as agents for the plaintiffs, there is no evidence that they had any authority to act for the plaintiffs with reference to it after they had procured it and turned it over to the plaintiffs.

The remaining question in the case arises out of the contention that McCormick had authority to receive notice of and agree to the cancellation and surrender of the policy. We are of the opinion that this question should have been submitted to the jury. Under the land contract, it was the duty of Arthur L. McCormick, not merely to procure insurance, but to keep the property insured and pay the premiums therefor for the benefit of his vendors, and the plaintiffs understood that Byron J. McCormick represented and was acting for Arthur L. McCormick in this regard.

Mr. Dixon testified that Byron J. McCormick—

" Had more authority than I had in regard to the insurance. He placed it all originally *and was in charge of it at this time.* * * *

"I did not go to Mr. Murphy with the policies, but he, or some one from his office, came to me for them. * * *

" We wanted the clauses in the policies made uniform as we desired and he, Mr. Murphy, was looking after that. He had the printed form I guess. He was under Mr. McCormick's instructions as much as he was under mine."

We cannot say, as a matter of law, that a jury would not be warranted in finding from this record that the whole subject of procuring, maintaining, and paying for insurance was committed to Arthur L. McCormick by plaintiffs and that they understood that Byron J. was acting for them in the place of his brother Arthur, whom, by their contract, they had made their agent for that purpose. If the jury should find that Byron J. was the agent

and representative of the plaintiffs, with general authority over the insurance, and, further, should find that Miss Ferrier had the conversations with McCormick and Murphy, and obtained the policies as testified by her, they would be warranted in finding a valid surrender of the policies for cancellation.

The judgment is reversed, and a new trial granted.

McALVAY, MONTGOMERY, OSTRANDER, and HOOKER, JJ., concurred.