LAUHOFF et al. v. AUTOMOBILE INS.
CO. OF HARTFORD, CONN.

No. 343–D.

District Court, E. D. Illinois.
Aug. 29, 1944.

Bookwalter, Carter & Gunn, of Danville, Ill., for plaintiffs.

Sam Levin, of Chicago, Ill., and Wm. Acton, of Danville, Ill., for defendant.

LINDLEY, District Judge.

Plaintiffs, copartners as Lauhoff Grain Company, sue to recover under two policies insuring against loss of use and occupancy, each for $40,000. One expired June 6, 1943, the other October 15, 1943. The policies covered the plant, machinery and equipment of plaintiffs in Chicago Heights, all of which, except the building, was removed to Danville in the summer of 1942. Plaintiffs rely upon an oral contract to transfer the executed policies to the Danville location. Defendant denies that any valid contract was ever made. It is a member of the so-called "Aetna group" consisting of a number of affiliated insurance companies, operating frequently through common agencies. The questions of fact presented center themselves largely about two inquiries—whether John Failing, since early 1942 an officer in the United States Army Air Corps, was an agent with actual or apparent authority to make a parol contract to transfer the policies, and, if so authorized, whether he actually made such an agreement.

Lauhoff, directing partner of plaintiffs, prior to 1938, lived in Detroit. There too lived John Failing, who, according to the testimony of Crowder, the assistant manager of defendant's Detroit office, had been appointed agent for defendant before Crowder became associated with the Detroit office and was retained thereafter. This statement constitutes all of the evidence as to the character of the agency of Failing, other than such as may be reasonably inferred from the facts and circumstances proved. Failing represented other companies as well as the Aetna group, but wrote most of his insurance in that group. For this business, defendant paid him a commission of 10%. Lauhoff, until he moved to Danville, procured most, if not all, his insurance from Failing.

Following 1938 Lauhoff lived in Chicago, and his company, manufacturing principally industrial cereals, operated at Chicago Heights. In June 1941 Lauhoff applied to Failing for use and occupancy insurance policies. One for $40,000 was prepared, handed to Failing and, by him, delivered to Lauhoff. It ran for one year. Failing presented the bill for the premium to Lauhoff who paid Failing. Later, in October, 1941, the same transaction occurred as to the second policy. Each policy was renewed in 1942, and at the time of renewal of each defendant knew that removal was in process. It is upon these existing policies that plaintiffs rely, which, they say, it was agreed should be transferred to Danville.

In November, 1941, plaintiffs procured an option to purchase the Fecker Brewing Company building in Danville. Lauhoff had become interested in this property before that time but had been unable to procure a contract earlier because of one outstanding in favor of another party. In the first week of January 1942, he took up his option and plaintiffs became the owner, it being their intention to remove their equipment and machinery from Chicago Heights to Danville. During the spring and summer of 1942, plaintiffs repaired and altered the building in Danville. In August and September, 1942, the machinery was moved from Chicago Heights to Danville, production being proportionately gradually tapered off in Chicago Heights and developed in Danville. While these events were taking place, defendant, with knowledge of the developments, rewrote the policies, that is, renewed them on the Chicago Heights situs for periods ending in June and October, 1943.

Early in 1942, Crowder, a part of whose duties it was to procure business, either through information from Failing or otherwise, learned of the progressing removal from Chicago Heights to Danville and talked to Failing, saying that he had been reared in the latter city and

knew the building plaintiffs were buying and requesting Failing "to get busy and get as much of the insurance" thereon as possible. Failing replied that he had already discussed the matter with Lauhoff, who had promised him some of the insurance. Still later Crowder told Failing that men from Chicago were in Danville making an inspection and again insisted that Failing procure as much of the insurance as possible. Failing reported that Lauhoff had said that he would have to place some of his insurance in Danville, but had agreed that defendant could at least retain the insurance it had. Still later Crowder called Failing, said to him that other companies were cutting in on the business and again requested him to "get busy." Failing assured Crowder that it had been agreed that defendant could keep the U & O insurance, transferring it to Danville, and that Lauhoff had promised to try to give Failing some additional business. As a result of all their conversation, according to Lauhoff and as I find the fact to be, Lauhoff and Failing agreed that the U & O policies should be transferred from Chicago Heights to Danville.

On October 14, 1942, Failing reminded Lauhoff that the policy of October 15, 1941, was expiring. Lauhoff informed Failing that the removal was almost complete and would be entirely finished in a few days and that, therefore, the new policy should probably be written for Danville, but Failing replied that until Lauhoff was sure of the definite time when he would be through moving, the policy should be carried on the Chicago Heights location and renewed for that point and that, when fully moved, Lauhoff would merely have to let him know and that the insurance would cover Danville from that time on. Consequently, on October 20, Lauhoff wrote Failing that the removal had been completed and requested him to change the insurance to Danville. His letter was delivered at Failing's army office on October 23, but not received by the latter until the 24th. Failing then wrote to defendant requesting the formal transfer, but, before the letter reached defendant, on Sunday, October 25, the building was badly damaged by fire.

On Monday, Lauhoff called Failing, reporting the fire. Failing said not to worry, that plaintiffs were properly covered, that everything would be taken care of prop-erly but that "it always took a few days." Later Lauhoff asked Failing whether his company would like to use the same adjustors who were adjusting the other insurance losses and he replied that he thought that would be satisfactory but that he would have to consult the Chicago office. Olson, in charge there, replied that he did not think that the company had any insurance on Danville. This was the first time plaintiffs knew of any question as to the coverage. Failing told Olson that he did not understand how that could be; that he had handled the transfer in the normal method; that he had given Lauhoff assurance that plaintiffs were covered and that plaintiffs were entitled to have their money. Still later, defendant definitely refused to recognize liability and the suit followed.

When Lauhoff told Failing he wanted the insurance transferred, Failing agreed to make the change in location and said that all Lauhoff needed to do was to call or write him when the property was completely removed and that the transfer would be completed and the coverage attach to Danville instead of Chicago Heights upon completion of the telephone call or mailing the letter. At all times Failing knew that Lauhoff had other insurance in Danville but none replacing the U & O policies. From these facts and circumstances and others which I think it unnecessary to reiterate, I find that there was a valid oral contract between Failing and plaintiffs to transfer the existing policies and the already accepted risk from Chicago Heights to Danville before the loss occurred.

Upon the question of the authority of Failing, I have observed that Crowder himself testified that Failing was an agent for the Aetna group; that Crowder, in behalf of defendant, had specifically repeatedly requested Failing to procure the insurance on the Danville plant; that for all the policies Failing procured from the Aetna group for Lauhoff, Failing presented the bills for the premiums to the insured and collected the money. Failing was the only man with whom Lauhoff ever dealt in procuring insurance from this group over a period of years.

Among the insurance policies purchased by Lauhoff from Failing was one of defendant for $1500 covering personal effects, such as is usually carried by travelers. This policy, like the others, was de-

livered by Failing and the premium paid to Failing. The original policy was not countersigned, the space for the signature appearing before the word "agent" being left blank. However, a loss occurred and the company recognized its liability and paid the loss. Following this payment, an agreement was made to reinstate so much of the face amount of the policy as was represented by the amount of loss, upon the payment of additional premium. This agreement was made February 17, 1942, and recited that in consideration of the additional premium the policy was reinstated for the full amount of $1500 as originally written. This statement was made upon a regular blank of defendant, partly printed and partly in typewriting, and was signed by Failing before the printed word "agent." For all intents and purposes the execution of this insurance contract by Failing was the same as writing an original policy. Consequently, it must be accepted as a fact that there is proof of Failing's authority to write contracts of insurance.

Defendant insists that this policy was effective any place in the country and that because of such character, authority to write it would not include authority to write other insurance. But Lauhoff testified and I find it to be a fact that Lauhoff was never advised of any restrictions or limitations upon Failing's part to contract for insurance in behalf of defendant.

In view of Crowder's testimony that Failing was an agent of defendant before Crowder came to Detroit and that he continued as such agent, the fact that Crowder specifically instructed Failing to procure insurance on the Danville plant; that Failing did write an insurance contract for defendant, submitted bills and collected premiums therefor, and all other facts and circumstances, I find as a fact that Failing had actual authority, necessarily implied from all the facts and circumstances, to make the oral contract to transfer the existing insurance from Chicago Heights to Danville.

This finding is made with full cognizance of defendant's claim that any authority of Failing was confined to Michigan and that he had no authority to make contracts in Illinois. The facts I have noted are to the contrary, and defendant has not seen fit to overcome their effect by attempting to show any limitation upon his authority, if indeed such secret limitation were admissible as against plaintiffs in view of their lack of knowledge thereof.

The legal effect of the statute of Illinois requiring agents in Illinois to be duly authorized in a certain manner and the legal effect of the fact that policies in Illinois were ordinarily issued from the Chicago office, I shall discuss in my memorandum.

I find that not only was actual authority, following as a necessary implication from the facts and circumstances, vested in Failing, but that the facts here demonstrate clearly also apparent agency and acts upon Failing's part clearly within the scope of his apparent authority. Irrespective of his actual authority, it seems to me that when Failing for a number of years was permitted without objection upon the part of defendant to procure insurance, to act as agent of the company, according to Crowder, received implicit instructions to procure the insurance in Danville, and wrote a policy of insurance, signing his own name thereto as agent, all without objection and with at least the tacit approval of defendant, and we give due weight to all the other facts and circumstances, there can be no question, and I so find, that Failing had apparent authority to do what he did. Plaintiffs relied upon this apparent authority and defendant is estopped to deny it. Whether Failing's actual authority and his apparent authority were co-extensive in scope becomes immaterial, in view of the fact that his acts were clearly within the scope of either.

It is a fact, too, that when policies were to be written in Illinois ordinarily when the application was presented the Detroit office would call the Chicago office and request the policy to issue. This indeed is what happened when the original policies were written on the Chicago Heights property, but those policies issued as a matter of course when Failing requested their issuance.

The legal questions involved I shall dispose of in my memorandum.

After stating the facts:

█ It is no longer doubted that insurance companies like other corporations may enter into parol contracts. These include preliminary agreements to issue new policies, to renew existing policies, or to transfer existing insurance from one location to another upon removal of property. Hartford Fire Ins. Co. v. Farrish,

73 Ill. 166; Aetna Ins. Co. v. Maguire, 51 Ill. 342; Farmers' & M. Ins. Co. v. Chesnut, 50 Ill. 111, 99 Am.Dec. 492; Firemen's Ins. Co. v. Kuessner, 164 Ill. 275, 45 N.E. 540; Stoelke v. Hahn, 55 Ill.App. 497; Fire Ass'n of Philadelphia v. Smith, 59 Ill.App. 655; Milwaukee Mechanics' Ins. Co. v. Schallman, 188 Ill. 213, 59 N.E. 12; Concordia Fire Ins. Co. v. Heffron, 84 Ill.App. 610; Hawthorne v. German Alliance Ins. Co., 181 Ill.App. 88; Fire Ins. Co. v. Sinsabaugh, 101 Ill.App. 55; Wilson v. Hartford Fire Ins. Co., 188 Ill.App. 181. The reason underlying the decisions is graphically expressed in Eames v. Home Ins. Co., 94 U.S. 621, 627, 24 L.Ed. 298, where the court said: "If parties could not be made secure until all the formal documents were executed and delivered, especially where the insuring company is situated in a different state, the beneficial effect of this benign contract of insurance would often be defeated and rendered unavailable. As said by Mr. Justice Field, in the case of Ins. Co. v. Colt, 20 Wall. [560], 567 [22 L.Ed. [423], 425], 'It would be impracticable (for a company) to carry on its business in other cities and States, or at least the business would be attended with great embarrassment and inconvenience, if such preliminary arrangements required for their validity and efficacy the formalities essential to the executed contract.' * * * If no preliminary contract would be valid unless it specified minutely the terms to be contained in the policy to be issued, no such contract could ever be made or would ever be of any use. The very reason for sustaining such contracts is, that the parties may have the benefit of them during that incipient period when the papers are being perfected and transmitted." See also Union Mut. Ins. Co. v. Wilkinson, 80 U.S. 222, 20 L.Ed. 617; Hartford Fire Ins. Co. v. Tatum, 5 Cir., 5 F.2d 169; National Liberty Ins. Co. v. Milligan, 9 Cir., 10 F.2d 483; Aetna Ins. Co. v. Licking Valley Milling Co., 6 Cir., 19 F.2d 177, certiorari denied 275 U.S. 541, 48 S.Ct. 37, 72 L.Ed. 415; annotation 69 A.L.R. 559. Specific instances of valid contracts to transfer existing insurance upon removal to a new location are Cooper v. German-American Ins. Co., 96 Minn. 81, 104 N.W. 687; Pollock v. German Fire Ins. Co., 127 Mich. 460, 86 N.W. 1017; Damon v. Kaler, 229 Mass. 215, 118 N.E. 270; Shutts v. Milwaukee Mechanics' Ins. Co., 159 Mo.App. 436, 141

S.W. 15; Hulen v. National Fire Ins. Co. of Hartford, 80 Kan. 127, 102 P. 52; Williamsburg City Fire Ins. Co. v. Cary, 83 Ill. 453; Cech v. Firemen's Ins. Co., 201 Ill.App. 321; Maryland Fire Ins. Co. v. Gusdorf, 43 Md. 506; Kor v. American Eagle Fire Ins. Co., 104 Neb. 610, 178 N.W. 182. In the last cited case the agent, authorized to write insurance in one county, was held to have authority to make a valid oral agreement to transfer it to another. In Williamsburg City Fire Ins. Co. v. Cary, supra, the court said: "After the goods had been removed to the place where they were destroyed, the company's local agent was notified of such removal, and was asked to consent to carry the risk in the new location. This fact is not controverted, but whether such agent did in fact give his consent is a matter of contention between the parties. As we have seen, the finding was for plaintiff, and that ought to be regarded as conclusive. * * * Equitably, if the company did not desire to carry the risk longer, because of the change in the location of the goods, it ought, in fair dealing, to have returned the unearned premium and rescinded the insurance contract. * * * Had the company cancelled the policy, as was its privilege, the assured could, doubtless, have been able to procure other insurance, and in all probability would have done so. The non-action of the company was an indication it was willing to continue the policy in force, and may reasonably have inspired that belief in the mind of the assured."

Here the risk had been accepted; the terms of the policies fixed and the contracts of insurance completed, all by the formal instruments issued in 1941 and renewed in 1942. There was, therefore, no uncertainty as to terms between the parties, and the agreement to transfer the location of the insurance from Chicago Heights, Illinois, to Danville in the same state left nothing uncertain. If any different rate was involved, that, according to ordinary rules, would have been covered by additional bills for premiums or, if lower, by reimbursements. Firemen's Ins. Co. v. Kuessner, supra, Cottingham v. National Mut. Church Ins. Co., 290 Ill. 26, 34, 124 N.E. 822. It appears that even before the October policy was renewed some uncertainty existed in the minds of the parties as to whether it should be rewritten on the Chicago Heights property or on that in Danville but that, in view of the

fact that the removal had not yet been actually completed, Failing suggested that it be rewritten on Chicago Heights even though all the property would be removed to Danville in a few days. In this situation it was proper and even necessary, in order to carry out the intention of the parties, to have the supplemental agreement to transfer from Chicago Heights to Danville. When the removal had been completed, according to the terms of the oral agreement, notification of completion of removal was the only essential act remaining to be performed. This was completed on October 20.

■■■■ The real controversy here turns upon the authority of Failing, its scope and whether his acts were within that scope, whether actual or apparent, so as to bind defendant. I have referred to some of the more salient facts indicating to me clearly that Failing was endowed with actual authority to act in the premises. Such actual authority may be implied from the facts if they be of such character as to imply an intention upon defendant's part to create the agency. 2 C.J.S., Agency, § 23, pp. 1045, 1048, 1050. Failing was some kind of an agent of the company. This, Crowder, the general agent of defendant, testified to. He was the kind of agent who could and did write and deliver a contract of insurance of certain character. Crowder specifically directed him to secure all the insurance he could on the Danville plant. He delivered defendant's policies and collected the premiums therefor. He was the only agent of defendant with whom Lauhoff transacted business, and he came to Lauhoff endowed with specific authority from Crowder to secure insurance on the Danville plant. All the facts, it seems to me, are consistent only with actual authority upon the part of Failing to secure the insurance. Commissioned to perform a certain definite thing, he had all the power and authority to do everything necessary to effectuate culmination of the undertaking. Restatement of Agency, secs. 35, 36, 43, 49, pps. 89, 90, 91, 103, 118, 119.

■■■■ In addition, the facts and circumstances prove clearly an ostensible or apparent agency which arises whenever a person whether or not authorized, reasonably appears to third persons, because of the manifestations of a supposed principal, to be authorized to act for such principal. Restatement of Agency, sec. 8, p. 25; 2

C.J.S., Agency, § 23, pp. 1046, 1048. The authority may be presumed from silence of the alleged principal when he knowingly allows another to assume to act for him as his agent, and the question as to his scope of authority resolves itself into determination of what power persons of reasonable prudence, ordinarily familiar with business practices, dealing with the agent, might rightfully believe him to have on the basis of the principal's conduct. Here defendant permitted Failing not only to solicit insurance policies but to write them. On the admission of defendant, he had for years been some kind of an agent. That admission having been made, any limitations upon his authority must have been brought to the attention of Lauhoff or other persons dealing with him before it can be claimed that his acts were beyond the scope of his authority. He had procured from defendant, policies of insurance upon the Chicago Heights property. He had collected the premiums for that insurance. He delivered to defendant upon defendant's blanks a contract of insurance executed by himself as agent. He had been commissioned to secure all the business he could on the Danville plant. In this situation the language of the Supreme Court in Union Mut. Ins. Co. v. Wilkinson, supra, 80 U.S. 234, 20 L.Ed. 617, is applicable: "The party * * * rarely sees or knows anything about the company or its officers by whom it is issued, but looks to and relies upon the agent who has persuaded him to effect insurance as the full and complete representative of the company, in all that is said or done in making the contract. Has he not a right to so regard him? It is quite true that the reports of judicial decisions are filled with the efforts of these companies, by their counsel, to establish the doctrine that they can do all this and yet limit their responsibility for the acts of these agents to the simple receipt of the premium and delivery of the policy. * * * to apply such a doctrine, in its full force to the system of selling policies through agents, which we have described, would be a snare and a delusion, leading, as it has done in numerous instances, to the grossest frauds, of which the insurance corporations receive the benefits, and the parties supposing themselves insured are the victims. The tendency of the modern decisions in this country is steadily in the opposite direction. The powers of the agent are, prima facie, coextensive

with the business intrusted to his care, and will not be narrowed by limitations not communicated to the person with whom he deals." To the same effect are Southern Life Ins. Co. v. McCain, 96 U.S. 84, 86, 24 L.Ed. 653; Hall v. Union Indemnity Co., 8 Cir., 61 F.2d 85, at page 91, certiorari denied 287 U.S. 663, 53 S.Ct. 222, 77 L.Ed. 572; Cooley on Insurance, 2d Ed., Vol. 1, p. 463, and the Illinois cases cited. In Southern Life Ins. Co. v. McCain, supra [96 U.S. 86, 24 L.Ed. 653], the court said: "No company can be allowed to hold out another as its agent, and then disavow responsibility for his acts. After it has appointed an agent in a particular business, parties dealing with him in that business have a right to rely upon the continuance of his authority, until in some way informed of its revocation. The authorities to this effect are numerous, and will be found cited in the treatises of Paley and Story on Agency. The law is equally plain, that special instructions limiting the authority of a general agent, whose powers would otherwise be coextensive with the business intrusted to him, must be communicated to the party with whom he deals, or the principal will be bound to the same extent as though such special instructions were not given. Were the law otherwise, the door would be open to the commission of gross frauds. Good faith requires that the principal should be held by the acts of one whom he has publicly clothed with apparent authority to bind him." See also Wilson v. Hartford Fire Ins. Co., 188 Ill.App. 181. When Crowder instructed Failing to secure the Danville insurance, the latter proceeded to renew upon the Chicago Heights property and promised to transfer it to Danville when the move was completed. It must be held that his acts were within his power, for his authority was coextensive with the business intrusted to his care and cannot be narrowed by limitations not communicated to plaintiffs.

 Defendant insists that Failing was only an insurance broker. But a broker may be authorized by the insurance company to act in its behalf, just as any agent. Terminology has no significance. Aetna Ins. Co. v. Maguire, 51 Ill. 342; Union Ins. Co. v. Chipp, 93 Ill. 96, at page 100. The facts must speak for themselves, and whether the acts of the principal in holding out the agent are such as to create either actual or apparent agency

to do the thing done is a question of fact. This I have resolved against defendant. See International Paper Co. v. General F. Assur. Co., 2 Cir., 263 F. 363; 32 C.J. 1055, 1056. This is true even though the acts of the agent be in violation of private instructions or limitations upon his authority of which the person dealing with him acting in good faith has no actual or constructive knowledge. Farmers', etc., Ins. Co. v. Chesnut, 50 Ill. 111, 99 Am.Dec. 492; Gray v. Merchants Ins. Co., 113 Ill. App. 537; 32 C.J. 1063.

 There is another ground upon which the actual agency of Failing must be sustained. Where an insurance company authorizes its general agent to receive proposals for insurance and countersign policies, such an agent may appoint sub-agents and authorize them to solicit insurance and forward applications on which, if approved, the agent issues policies. The acts of his agents while acting in such capacity are the acts of the company and binding on it. Insurance Co. of North America v. Thornton, 130 Ala. 222, 30 So. 614, 55 L.R.A. 547, 89 Am.St.Rep. 30; 32 C.J. 1069. Cooley on Insurance, 2d Ed., Vol. 1, p. 475; Restatement of Agency, sec. 79, p. 188, sec. 80, p. 191.

 Defendant points out that the statutes of Illinois prescribe certain formalities for foreign corporations doing business through agents in Illinois and that there is no showing that Failing was authorized in compliance with the statute. But statutory requirements that policies shall be executed in a certain manner or by a certain party do not apply to preliminary contracts. 32 C.J. 1100. The statute of Illinois does not affect the corporate power of defendant to make valid contracts with third parties through its agents. It directs defendant to act in a certain manner, but if defendant fails to comply with the legislative mandate and renders itself subject to prosecution for violation thereof, that fact in no way impairs the authority of its agents to act in violation of the statute. In other words, the statute does not invalidate the contract even though it may subject the principal or the agent to a penalty. It would be strange logic that would permit the company to plead its failure to comply with a statute as defense to a contract which it had actually authorized its agent to make. Nor are plaintiffs bound by any secret instruc-

tions binding Failing's authority to any certain territory. Cooley on Insurance, 2d Ed., Vol. 1, p. 486, 487.

Other contentions have been presented which in view of my conclusions I do not deem it essential to discuss. All vital findings of fact are included in this memorandum and my conclusions of law are given expression likewise. I find that under the facts found and the conclusions stated, plaintiff is entitled to recover.